Julio A. MERCADO GARCIA, Maria Del Carmen Avila Mojica, and the conjugal partnership, Plaintiffs,

v.

PONCE FEDERAL BANK, F.S.B., Ramiro L. Colon Muñoz, and Jose F. Blasini Lloveras, Defendants.

Civ. No. 89–0949 (JAF).

United States District Court, D. Puerto Rico.

Oct. 16, 1991.

---

12. As a result this Court declines to disallow certain expenses, as was done in its original

action on this Motion.

Harry Anduze–Montaño, Pía Gallegos, San Juan, P.R., for plaintiffs.

Gregory T. Usera, Rosa M. Cruz–Niemiec, Goldman Antonetti Ferraiuoli & Axtmayer, Cobian & Ramos, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

In an Opinion and Order issued on March 22, 1991 (Docket Document No. 49), this court dismissed plaintiffs' causes of action based on alleged violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, ("ADEA") and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"). Also, because we believed that plaintiffs' remaining federal claims, based on supposed violations of the Equal Credit Opportunity Act, as amended, 15 U.S.C. §§ 1691–1691f, ("ECOA"), and the notice requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, 29 U.S.C. §§ 1161–1168, ("COBRA"), were ripe for summary disposition, we ordered the parties to file cross-motions for summary judgment on the above-mentioned claims. We also reserved judgment as to whether this

court would exercise pendent jurisdiction over the state law claims.

Having received the parties' motions,[1] for the reasons stated below, we now grant defendants' motion for summary judgment and dismiss plaintiffs' ECOA, COBRA, and breach of contract causes of action.[2] Further, we decline to exercise jurisdiction over any remaining pendent state law claims and, therefore, *dismiss* plaintiffs' amended complaint.

## I. *Facts*

The underlying facts in this dispute revolve around the employment termination of plaintiff Mercado by defendants and have been outlined in this court's earlier Opinion and order. (Docket Document No. 49 at 2–4). Here, we will focus only on the facts relating to the remaining federal claims.

### A. Loan Agreement

On April 11, 1986, a loan agreement was executed between plaintiff Mercado and defendant Ponce Federal Bank, F.S.B. ("Ponce Federal" or "Bank"), in which the Bank loaned plaintiff $14,000. In the Loan/Line Fact Sheet, the loan is described as a one year, demand loan without collateral, with a balloon payment to be extended at maturity date and interest paid monthly at the New York prime interest rate. (Docket Document No. 53, Exhibit 1). A promissory note, signed by plaintiff, was also executed which called for payment on demand. (*Id.*, Exhibit 2). Also submitted were the minutes of a bank Management Credit Committee meeting held on April 7, 1986 at which Mercado's loan was approved. (*Id.*, Exhibit 3).

After one year, the bank granted an additional one-year term for payment of the principal. This extension was also approved by the Management Credit Committee. (*Id.*, Exhibits 5–7). At the end of the second year, the bank granted plaintiff a further six-month extension. In a memo, dated June 24, 1988, to Maria Muñiz, Manager of the Commercial Credit, a supervisor of the Collections Unit reported that: plaintiff's loan had become due on April 11, 1988; he had been making his interest payments and periodically paid on the principal; and that plaintiff had requested a six-month extension. The supervisor requested that the extension be granted administratively. (*Id.*, Exhibit 8).

Finally, on November 23, 1988, after plaintiff had been terminated from the bank, the bank notified him that his loan would become due on December 24, 1988. (*Id.*, Exhibit 9).

### B. Credit Card

As an employee of Ponce Federal, plaintiff Mercado had both an assigned employee checking account and a VISA credit card which was specially offered to employees. With the checking account, plaintiff had a $3,000 credit line. In the case where plaintiff's available balance would not cover the amount of a check drawn on the account, the reserve account would be activated and, in effect, would create a credit line upon which plaintiff could draw. When an employee left the Bank's service, the employee checking account would be closed and, if the former employee so chose, a regular checking account would be opened.

On October 1, 1988, after having been informed at least once that he was going to be discharged, plaintiff went to a branch of the Bank and cashed a $4,200 check drawn from his employee checking account. Because he did not have sufficient funds, the reserve fund was activated and $2,900 was transferred to his checking account to cov-

---

1. We note that plaintiffs filed a Motion in Compliance with March 22, 1991 Order (Docket Document No. 52), in which they argue that there remain genuine issues of material fact, thereby precluding summary disposition of the case. Plaintiffs also filed an Opposition to defendants' summary judgment motion.

2. In plaintiffs' Motion in Compliance (Docket Document No. 52), they argue that, in fact, there remain four federal causes of action, two based

on violations on ECOA, one based on a COBRA violation and the fourth a breach of contract claim based on a banking transaction in a dependency or insular possession over which this court has jurisdiction pursuant to 12 U.S.C. § 632. We agree with plaintiffs that we have jurisdiction over the breach of contract claim and, since both parties have briefed the issues involved in this cause of action, the court will rule as to this claim.

er the check. Because there remained a debit balance, the employee account could not be closed.

Likewise, once an employee completes the probationary period, they can obtain bank credit cards (VISA or Mastercard) with a pre-approved limit and with no annual fees. Plaintiff's limit was $5,000. When the employee ceases employment with the bank, the credit card is recodified as a regular credit card and the employee becomes responsible for the annual fee. The credit card agreement contained a standard cancellation clause granting the bank the authority to revoke the card without notice to the cardholder. (*Id.*, Exhibit 13).

On October 6, 1988, plaintiff, using his VISA card which had not yet been recodified, withdrew $1,600 in four $400 transactions at four different electronic banking machines. Along with drawing on his reserve, these transactions resulted in plaintiff incurring a total indebtedness to the Bank of $4,500. As of May 1991, according to defendants, this balance has not been repaid to the Bank.

Thereafter, on October 10, 1988, the Bank restricted plaintiff's VISA card. The Bank's stated reasons were to reevaluate plaintiff's credit and to recodify the credit card. (*Id.*, Exhibit 11). Mercado discovered the fact that the card was restricted when he attempted to use it to pay for gas on October 14, 1988. The next day he wrote a letter to a bank official explaining the incident and requesting that the situation be rectified. (Docket Document No. 61, Exhibit H).

On October 24, 1988, action was taken with respect to the credit card. Although not completely clear from the record, either a new VISA card was issued to plaintiff or, as defendants contend, the prior VISA account was recodified and reactivated.

### C. Group Health Plan

On October 13, 1988, Francisco Portuondo, plaintiff's successor, sent a letter to plaintiff advising him of his right to continue his group health coverage, as well as the form specifying the premiums which plaintiff would have to assume. (Docket Document No. 53, Exhibits 14–15). This letter was sent first-class mail. Plaintiff claims never to have received the letter and election form.

On November 13, 1988, plaintiff Mercado sent defendants a letter stating that he had received no information as to his rights under his group health insurance plan. (Docket Document No. 61, Sworn Statement—Julio Mercado at ¶ 58). In response to plaintiff's letter, defendants sent a second letter dated November 22, 1988, making specific reference to the earlier letter and enclosing the October 13th letter, as well as the election form. (Docket Document No. 56, Exhibit 16). This latter correspondence was sent certified mail—return receipt requested. Plaintiff admits to having received this second letter and the supporting documents on November 29, 1988. (Docket Document No. 61 at ¶ 59).

Plaintiff never returned the completed election forms to defendants and, therefore, never elected to continue the group health plan benefits.

### II. *Summary Judgment Standard*

Defendants have made a motion for summary judgment pursuant to Fed.R.Civ.P. 56. A court should grant a motion for summary judgment "if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). The two inquiries which the court must make before granting or denying a motion for summary judgment relate to the *materiality* and the *genuineness* of the factual dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir.1991); *Local No. 48, United Brotherhood of Carpenters & Joiners v. United Brotherhood of Carpenters & Joiners*, 920 F.2d 1047, 1050 (1st Cir.1990); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990).

■ In order to determine whether the factual dispute between the parties is "material", the substantive law will identify which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Sheinkopf*, 927 F.2d at 1262; *see generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725 at 93–95 (1983). Therefore, the law relating to ECOA and COBRA, as well as Puerto Rico law of contract and evidence, will provide the substantive basis for determining which facts are "material" in this case.

■ The second determination relates to the "genuineness" of the dispute about the material facts. In *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510, the Court explicitly stated that a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." It is not required that the party opposing summary judgment, in asserting the existence of an issue of material fact, resolve it conclusively in order to proceed to trial, but rather that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial," *First Nat. Bank v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), thereby resolving the factual issues "before the related legal issues can be decided." *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989); *Sheinkopf*, 927 F.2d at 1262.

■ Further, when a motion for summary judgment is made, it is important to be precise as to the parties' burdens of production and persuasion.

> The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party. The court need not decide whether the moving party has satisfied its ultimate burden of persuasion until the court finds that the moving party has discharged its initial burden of production.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986) (citations omitted); 10A Wright, Miller & Kane § 2727. The initial burden of production imposed on the moving party is to make a *prima facie* showing that it is entitled to summary judgment and, where it is the moving party who will have the burden of persuasion at trial, the motion must be supported by credible evidence "that would entitle it to a directed verdict if not uncontroverted at trial." *Celotex*, 477 U.S. at 331, 106 S.Ct. at 2557. Only then does the burden of production shift to the party opposing the motion. Where it is the nonmoving party who will have the burden of persuasion at trial, the moving party may satisfy the Rule 56 burden of production in one of two ways.

> First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* 10A Wright, Miller & Kane § 2727, pp. 130–131; Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745, 750 (1974).

*Celotex*, 477 U.S. at 331, 106 S.Ct. at 2557. When the moving party chooses the second option and moves for summary judgment on the ground that the nonmoving party—who will bear the burden of persuasion at trial—has no evidence, the moving party "must affirmatively show the absence of evidence in the record." *Celotex*, 477 U.S. at 331–32, 106 S.Ct. at 2557. Throughout this analytical process, any doubt as to the existence of a genuine issue of fact should be resolved *against* the moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), and courts "must review the evidentiary record in the light most hospitable to the nonmovant and must indulge all reasonable inferences in his favor." *Sheinkopf,* 927 F.2d at 1262.

The matter before us provides a good example of how this analytical framework guides the court in deciding a summary judgment motion. Defendants, the moving party, have the initial burden of production and the ultimate burden of persuasion as to whether they are entitled to judgment as a matter of law. Here, defendants have fulfilled their initial burden of production. They have come forward with credible evidence, using both affidavits and other documentary evidence, in support of their motion. The terms of the loan agreement, the credit card contract, the COBRA letters and the accompanying affidavits, if uncontroverted, establish the material facts that would entitle defendants to judgment as a matter of law.

Plaintiffs, on the other hand, mainly through the use of affidavits, seek to establish genuine issues of material fact requiring trial. However, after carefully reviewing their oppositions, we think that plaintiffs have failed to meet their burden of production. True, they do raise factual disputes. For example, plaintiffs claim that there was an oral representation made by defendant Blasini relating to the loan agreement which changed the term of the loan to five years. Also, Mercado challenges defendants' assertion that he himself requested a renewal of the loan, thereby supposedly demonstrating that the agreement was automatically renewed. Also, plaintiffs state that the employee VISA card issued to Mercado was not recoded until 1990 and, in fact, plaintiff received a new VISA card in October 1988. Plaintiffs also challenge the authenticity of certain documents, including the October 13, 1988 letter notifying plaintiffs of their right to elect continued health care coverage.

Yet, as will be discussed in more detail below, with each of their claims, plaintiffs have failed to come forward with credible evidence to put into dispute any of the *material* facts recited above. For example, as to the COBRA claim, plaintiffs originally alleged that they never received notice. Defendants came forward with evidence, the November 22, 1988 certified letter and the return receipt, establishing that plaintiffs had received notice. In the November letter, mention is made as to the October 1988 letter. Plaintiffs now admit that they did, in fact, receive this latter notice. Nor do they dispute the fact that, after receiving the election form, they never elected to continue coverage. Where it is the interpretation of the facts, rather than the facts themselves which are in dispute, summary judgment is the appropriate vehicle for disposition of the action.

Plaintiffs' use of affidavits also merits some discussion. Plaintiffs attempt to establish issues of fact for trial mainly through plaintiff Mercado's affidavits. (*See* Docket Document Nos. 52, 61). Along with reaffirming all of the factual allegations in the amended complaint, thus verifying them "to the extent demonstrated to come within [plaintiffs'] personal knowledge," *Sheinkopf,* 927 F.2d at 1262, Mercado describes the various transactions relating to the remaining federal causes of action. However, as to the underlying facts relating to the loan agreement, credit card restriction, and COBRA notices, we find that plaintiffs raise no disputes in the affidavits which warrant their submission before a trier of fact.

In fact, in their opposition to defendants' summary judgment motion, plaintiffs include additional material facts which clarify their earlier statements and obviate the need for trial. Plaintiffs admit that they did, in fact, receive the November 1988 COBRA notice. They also admit that, after plaintiff Mercado's October letter to the bank complaining of the credit card suspension, his credit card was reinstated. And, while plaintiff Mercado claims that there was an oral agreement with defendant Blasini to automatically refinance the loan, he admits that each "refinanced" loan would be on the same terms, a one year commercial loan at the New York prime rate.

Finally, even if we were to interpret plaintiffs' Motion in Compliance and their Opposition to Motion to Strike, (Docket Document Nos. 52, 71), as a Rule 56(f)[3] motion for a continuance so as to conduct further discovery in order to more firmly anchor the facts used in their opposition, we would deny this motion. First of all, plaintiffs have not complied with Rule 56(f). They have filed no affidavit stating reasons why they could not present facts necessary to justify their opposition. In his affidavit accompanying plaintiffs' Motion in Compliance, Mercado makes no reference to the need for further discovery to establish facts found in his affidavit. While a court should normally apply Rule 56(f) liberally, it "need not employ the rule to spare litigants from their own lack of diligence." *Hebert v. Wicklund,* 744 F.2d 218, 222 (1st Cir.1984). In *Hebert,* the appellate court found that there was no abuse of discretion where a trial court refused to find certain documents to be the functional equivalent of a Rule 56(f) affidavit. *Id.* at 221–22. Even under the standards enunciated in *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 988–90 (1st Cir.1988), plaintiffs' submissions fall short as functional equivalents to affidavits. *See Price v. General Motors Corporation,* 931 F.2d 162, 164 (1st Cir.1991) ("The movant must (1) articulate a plausible basis for the belief that discoverable materials exist which would raise a trial-worthy issue, and (2) 'demonstrate good cause for failure to have conducted the discovery earlier.'" *Paterson–Leitch*). We have no representation that further discovery "will, if obtained, suffice to engender an issue both genuine and material." *Paterson–Leitch Co.,* 840 at 988; *see Sheinkopf,* 927 F.2d at 1263–64. Under such circumstances, where the affidavits and other documents submitted by the parties establish the material facts necessary to rule on the summary judgment motion and the opposing party has not proposed with any specificity the need for further *material* evidence, we see no need to delay ruling on defendants' motion. We, therefore, turn now to the substantive claims.

### III. *Discussion*

### A. ECOA Claims

Section 701, in relevant part, provides that:

> (a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—
>
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); ....

15 U.S.C. § 1691(a)(1). In the definitional section, "applicant" is defined as,

> [a]ny person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.

15 U.S.C. § 1691a(b). In section 202.1(b) of the Regulations relating to ECOA, the Board of Governors of the Federal Reserve System specify the underlying purpose of the regulations.

> The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); to the fact that all or part of the applicant's income derives from a public assistance program; or to the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The regulation prohibits creditor practices that discriminate on the basis of any of these factors. The regulation also requires creditors to notify applicants of action taken on their applications; to report credit history in the

---

**3.** Fed.R.Civ.P. 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

628

names of both spouses on an account; to retain records of credit applications; and to collect information about the applicant's race and other personal characteristics in applications for certain dwelling-related loans.

12 C.F.R. § 202.1(b) (1989).

■ Courts which have interpreted ECOA have used the same analytical framework as that used in actions pursuant to Title VII of the Equal Employment Opportunity Act, 42 U.S.C. §§ 2000e to 2000e–17. *See Bhandari v. First Nat. Bank of Commerce,* 808 F.2d 1082, 1100–01 (5th Cir.1987), *cert. denied,* 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990); *Gross v. U.S. Small Business Admin.,* 669 F.Supp. 50, 52–53 (N.D.N.Y.1987); *Williams v. First Federal Sav. and Loan Ass'n,* 554 F.Supp. 447 (N.D.N.Y.1981), *aff'd,* 697 F.2d 302 (2d Cir.1982); *Sayers v. General Motors Acceptance Corp.,* 522 F.Supp. 835, 839–40 (W.D.Mo.1981); *see generally, Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988). As the Court in *Burdine* has outlined the burden-shifting process:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 (citation omitted). Throughout this process, the ultimate burden of persuasion as to intentional discrimination remains with the plaintiff. *Id.* at 253, 101 S.Ct. at 1093. Therefore, in order for plaintiffs to meet the burden of proof as to a *prima facie* case of discrimination in the ECOA context, plaintiffs must demonstrate that: (1) Mercado is a member of a protected class; (2) he applied for and was qualified for an extension of credit; (3) despite his qualifications he was rejected, and (4) others of similar credit stature were extended credit or were given more favorable treatment than plaintiff. *See Gross,* 669 F.Supp. at 53.

Having reviewed the standard under ECOA, we now rule on plaintiffs' causes of action.

### 1. *Loan Agreement*

In the amended complaint, plaintiffs' eighth cause of action alleged that defendants' "premature cancellation" of plaintiff Mercado's loan resulted in a change in the terms of an existing credit arrangement. In their memorandum accompanying their motion in compliance with this court's order, they argue that they have established a *prima facie* case in that plaintiff Mercado: (1) was, because of his age, a member of a protected group; (2) had an existing credit relationship with the bank; (3) despite compliance with all of the requirements of the loan, had his loan prematurely called due, and (4) by this action, was treated differently from others who had similar loan arrangements with the bank. We disagree and find that plaintiffs have failed to meet their burden in establishing a *prima facie* case of discrimination.

■ First of all, it is not clear that plaintiff Mercado falls within the category of "applicant" which is protected under ECOA with respect to his loan agreement. Plaintiff applied for a one-year loan which was granted. Plaintiff was granted two extensions on that loan, one through the normal loan approval process and one administratively. The bank requested payment on the loan's due date. According to Mercado himself, he made no request to extend the loan. Under such circumstances, it is difficult to define plaintiff as an "applicant" for an extension of credit within the meaning of ECOA.

■ Second, we find that plaintiffs have failed to meet their burden in establishing a *prima facie* case. The evidence before the court demonstrates that the loan agreement which plaintiff Mercado executed was a one year term loan. Plaintiff does not dispute this fact. Nor does he argue that the refinancing of the loan was for a period of more than one year. The language of the loan agreements clearly reflect these facts. The minutes of the bank's loan approval committee also show that plaintiff's loan was processed according to normal bank procedures and was for a term of one year. Plaintiff has simply not come forward with the quantum of credible evidence to demonstrate that the bank's failure to offer another extension translates into discrimination.

■ Nor do plaintiffs come forward with any evidence to prove the fourth element of a disparate treatment claim. Both plaintiffs and defendants agree that the favorable terms of the loan were given to plaintiff Mercado in consideration of his employment position at the bank. At the time the loan became due in December 1988 Mercado was no longer in the bank's employ. Even if we assume that Mercado's status as a former bank employee was the primary motivation for the bank's decision not to grant a further extension, we would not have a discrimination claim, since a person's employment status is not a protected category within the meaning of ECOA. Also, other than conclusory allegations as to other alleged examples of age discrimination at the bank, plaintiff comes forward with no evidence that would link the alleged different treatment to his membership in a protected class. In sum, plaintiff has not met his burden of establishing a *prima facie* case of discriminatory treatment based on age.

■ Finally, even assuming *arguendo* that plaintiffs have established a *prima facie* case of discrimination, defendants have provided and proven a non-discriminatory reason for refusing a further extension of the loan based on the fact that plaintiff was no longer in the employ of the defendant bank and, therefore, not of the class that would receive the special loan terms granted to employees. Other than alleging that the calling due of the loan was part of a "pattern of harassment" against plaintiff Mercado, plaintiffs have come forward with no evidence as to why the bank's rationale might be pretextual. It is counterintuitive to think that, after separation from an employer, a former employee would still expect to qualify for such favorable loan terms given mainly to bank employees. In any case, we can find no basis where defendants' rationale could be considered a pretext for age discrimination in the granting of credit.

We, therefore, grant defendants' summary judgment motion and dismiss plaintiffs' eighth cause of action.

### 2. *Credit Card*

■ As to plaintiffs' twelfth cause of action, we again find that plaintiffs' have not met their burden in establishing a *prima facie* case of discrimination pursuant to ECOA. Plaintiffs admit that the credit card in question was one offered on special terms to employees. Plaintiff Mercado also admits that the proper procedure after an employee leaves the employ of the bank is to have the card recodified. Further, plaintiffs do not deny that, by October 24, 1988, plaintiff was again in possession of a credit card authorized by defendant bank. Under such circumstances we find it hard to comprehend how plaintiffs can claim that defendants *denied* them an extension of credit at the same time they *issued* a new credit card or how such a temporary restriction on the use of the card is in any way related to Mercado's age.

Again if we were to find that plaintiffs have established a *prima facie* case (which we do not), defendant has submitted uncontroverted evidence of a nondiscriminatory reason as to why Mercado's VISA card was restricted for the two-week period. In a matter of days, plaintiff had incurred indebtedness to the bank in the sum of $4,500 using mechanisms made available to him based on his status as a bank employee. The bank's stated, nondiscriminatory reasons for restricting the card, both to reevaluate Mercado's credit worthiness in

light of his new indebtedness to the bank and to recodify the card, are amply supported by the record. Added proof of the nondiscriminatory actions of the bank is the fact that, after October 24, 1988, plaintiff again had use of a VISA card.[4]

Again, we grant defendants' summary judgment and dismiss plaintiffs' twelfth cause of action.

### B. Breach of Contract Claim

As to the breach of contract claim, plaintiffs do not argue that the loan agreement which the parties executed refer to a one year term for the loan. Nor do they argue that plaintiff Mercado was coerced into signing this agreement. Rather, plaintiffs argue that, along with the written agreement, there existed an oral agreement between plaintiff Mercado and defendant Blasini whereby the latter would assure that the balloon payment due at the end of each year would be refinanced on the same terms—one year, commercial loan, at New York prime with optional partial payment of principal—for a term of five years. It is this "oral agreement" which plaintiffs claim defendants have breached by prematurely calling due the loan.

■ As a preliminary matter, because this court's jurisdiction as to the breach of contract claim is based on 12 U.S.C. § 632,[5] a federal statute, we find that federal common law choice of law directs the use of Puerto Rico substantive law as to the contract issue. *Corporación Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Citibank, N.A. v. Benkoczy*, 561 F.Supp. 184, 186–87 (S.D.Fla.1983).

Puerto Rico's parol evidence rule is found in Rule 69(B) of the Puerto Rico Rules of Evidence. Rule 69 provides:

(B) When in an oral or written agreement, either public or private, all the terms and conditions constituting the true and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties, or successors in interest, no evidence extrinsic to the contents of the same.

32 L.P.R.A.App. IV R. 69(B) (1983). This rule "exclude[s] extrinsic evidence concerning the terms of an agreement only when the agreement, whether written or oral, is clear and unambiguous." *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir.1987). Quoting a Puerto Rico Supreme Court case, *Hiers of Ramírez v. Superior Court*, 81 P.R.R. 347 (1959), the court clarified that "[t]he only terms which can be catalogued as clear are those which in themselves are lucid enough to be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation. *Id.; see also*, 31 L.P.R.A. § 3471 (1990) ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.").

■ Here, the contract term which plaintiffs propose to put into dispute using extrinsic evidence is the term of the loan agreement. Yet, the one year term in the contract is clear. Nor do plaintiffs dispute that the written loan agreement executed by Mercado and the bank specify a one year term. The term is in no way ambiguous. Therefore, applying Puerto Rico's parol evidence rule, evidence of conversations between Mercado and Blasini would

---

**4.** Here the court is not concerned with whether a new card was issued or the former card was recodified. In either case, credit was extended to plaintiff, thus precluding a claim based on ECOA.

**5.** Section 632 provides in relevant part:
Notwithstanding any other provision of law, all suits of a civil nature at common law or inequity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving ... banking in a dependency or insular pos-

session of the United States ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits. For purposes of this statute, Puerto Rico is included in the definition of a dependency or insular possession. *Conjugal Soc. Composed of Juvenal Rosa v. Chicago Title Ins. Co.*, 690 F.2d 1 (1st Cir.1982); *Díaz v. Pan American Federal Sav. and Loan Ass'n*, 635 F.2d 30 (1st Cir.1980).

be barred. Since this is the only evidence that plaintiffs raise to claim a breach of the loan agreement, this cause of action must be dismissed.

## C. COBRA Claim

Plaintiffs alleged in their amended complaint that, because defendants failed to notify them of their election rights under COBRA within fourteen days, plaintiffs did not elect coverage within the time allowable and were, therefore, prevented from continuing as participants and beneficiaries of the group health insurance plan. Later, plaintiffs admitted receiving the notice after receiving the November, 1988 letter from Ponce Federal.

Section 1165 defines the period in which parties may elect to exercise their COBRA benefits.

For purposes of this part—

**(1) Election Period**

The term "election period" means the period which—

(A) begins not later than the date on which coverage terminates under the plan by reason of a qualifying event,

(B) is of at least 60 days duration, and

(C) *ends not earlier than 60 days after the later of—*

(i) *the date described in subparagraph (A), or*

(ii) *in the case of any qualified beneficiary who receives notice under section 1166(4) of this title, the date of such notice.*

29 U.S.C. § 1165(1) (emphasis added). *See Communications Workers of America, District One v. Nynex Corp.,* 898 F.2d 887, 888–89 (2d Cir.1990). The accompanying proposed regulations give examples to explain the minimum period which a group health plan administrator must allow a qualified beneficiary to elect COBRA continuation coverage. Proposed Treas.Reg. § 1.162–26 at Q & A–32, 52 Fed.Reg. 22,-716 (1987) (to be codified at 26 C.F.R. pt. 1) (proposed June 15, 1987). To use the dates from our case, the date of the qualifying event was September 30, 1988. Assuming plaintiff's date as the date when the COBRA notice was sent, November 25, 1988,

plaintiff had a period of sixty days from *that date* to elect continued coverage. If the October 13, 1988 notice had been received, it would have been sixty days from that date. If the notice had been sent prior to the September 30, 1988 *and* the benefits would have ended on the same day as the qualifying event (plaintiff's termination), the sixty-day election period would have begun on September 30th. If, on the other hand, plaintiffs' group health benefits had continued until December 1, 1988, even though Mercado was terminated on September 30, 1988, his period of election could begin as late as December 1, 1988 and could not end before January 30, 1989.

As these examples illustrate, section 1165 represents Congress' intent to legislate a statutory minimum period in which qualified beneficiaries could make a COBRA election and not a maximum length for an election period's duration. *Accord Branch v. G. Bernd Co.,* 764 F.Supp. 1527, 1536–37 (M.D.Ga.1991) ("COBRA, the proposed regulations, and the House report simply set a floor below which the election period may not fall."). Therefore, the fact that plaintiffs did not receive notice until November 29, 1988 is not, in and of itself, determinative of whether the COBRA notice provision has been violated.

Here, it is undisputed that plaintiffs, even after receiving the COBRA notice, failed to elect continued coverage. The record is not clear as to when plaintiffs' group health plan, in fact, expired. However, this date is not necessary in that the record does establish that plaintiffs: (1) did receive proper COBRA notice; (2) had a sixty-day period in which to elect continued COBRA coverage, and (3) chose to not elect coverage within the sixty-day period commencing on November 25, 1988. Therefore, we find no COBRA violation and dismiss plaintiffs' eleventh cause of action.

## IV. *Pendent State Claims*

Plaintiffs have also alleged various causes of action based on state law. Because we have subject matter jurisdiction over plaintiffs' federal claims, we pos-

sess the power to exercise pendent jurisdiction over state law claims. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). However, since the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights, *Cohill*, 108 S.Ct. at 618, *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, and since the federal claims have been dismissed at an early stage of this litigation, we decline to exercise pendent jurisdiction over plaintiffs' state law claims and dismiss the remaining claims without prejudice.

### V.  *Conclusion*

In sum:

We grant defendants' summary judgment motion and dismiss plaintiffs' ECOA, COBRA and breach of contract causes of action.

We decline to exercise pendent jurisdiction and dismiss without prejudice the remaining causes of action based on state law.

Plaintiffs' amended complaint is dismissed.

IT IS SO ORDERED.