# GEISSAL, BENEFICIARY AND REPRESENTATIVE OF THE ESTATE OF GEISSAL, DECEASED v. MOORE MEDICAL CORP. ET AL.

No. 97–689.   Argued April 29, 1998—Decided June 8, 1998

SOUTER, J., delivered the opinion for a unanimous Court.

*S. Sheldon Weinhaus* argued the cause for petitioner. With him on the briefs was *Marc A. Greidinger.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Argrett, Deputy Solicitor General Kneedler, Gary R. Allen,* and *Teresa E. McLaughlin.*

*Bradley J. Washburn* argued the cause and filed a brief for respondents.*

JUSTICE SOUTER delivered the opinion of the Court.

The Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), authorizes a qualified beneficiary of an employer's group health plan to obtain continued coverage under the plan when he might otherwise lose that benefit for certain reasons, such as the termination of employment. The issue in this case is whether 29 U. S. C. § 1162(2)(D)(i) allows an employer to deny COBRA continuation coverage to a qualified beneficiary who is covered under another group health plan at the time he makes his COBRA election. We hold that it does not.

I

On July 16, 1993, respondent Moore Medical Corporation fired James Geissal, who was suffering from cancer. While employed, Geissal was covered under Moore's group health plan as well as the health plan provided by his wife's employer, Trans World Airlines (TWA), through Aetna Life Insurance Company.

According to Geissal, soon after he lost his job, Moore told him that he had a right under COBRA to elect to continue coverage under Moore's plan. Geissal so elected, and made the necessary premium payments for six months. On January 27, 1994, however, Moore informed Geissal it had been mistaken: he was not actually entitled to COBRA benefits

---

*\*Gill Deford, Mary Ellen Signorille, Melvin Radowitz, Daniel Feinberg,* and *Ronald G. Dean* filed a brief for the American Association of Retired Persons et al. as *amici curiae* urging reversal.

*Ray M. Aragon, Barbara J. Bacon,* and *Jeffrey Gabardi* filed a brief for the Health Insurance Association of America as *amicus curiae* urging affirmance.

because on the date of his election he was already covered by another group health plan, through his wife's employer.

Geissal then brought this suit against Moore, the Group Benefit Plan of Moore Medical Group, Herbert Walker (an administrator of the plan), and Sedgwick Lowndes (another administrator) (collectively, Moore).[1] Geissal charged Moore with violating COBRA by renouncing an obligation to provide continuing health benefits coverage (Count I); he further claimed that Moore was estopped to deny him continuation coverage because it had misled him to think that he was entitled to COBRA coverage (Count II), that Moore's misrepresentation amounted to a waiver of any right to assert a reading of the plan provisions that would deprive him of continuation coverage (Count III), and, finally, that Walker had violated COBRA by failing to provide him with certain plan documents (Count IV).

After limited discovery, Geissal moved for partial summary judgment on Counts I and II of the complaint. He argued that Moore's reliance upon 29 U. S. C. § 1162(2)(D)(i) as authority to deny him COBRA continuation coverage was misplaced. Although that subsection provides that an employer may cancel COBRA continuation coverage as of "[t]he date on which the qualified beneficiary first becomes, after the date of the election . . . covered under any other group health plan (as an employee or otherwise)," Geissal was first covered under the TWA plan before he elected COBRA continuation coverage, not after. In any event, Geissal maintained, Moore was estopped to deny him health benefits, because he had detrimentally relied upon its assurances that he was entitled to them. While the summary judgment motion was pending, Geissal died of cancer, and petitioner Bonnie Geissal, his wife and personal representative of his estate, replaced him as plaintiff.

---

[1] On November 8, 1994, the District Court granted the plaintiff's motion to dismiss Lowndes without prejudice.

The Magistrate Judge hearing the case[2] first rejected Moore's arguments that Geissal lacked standing and that Aetna was a necessary party under Federal Rule of Civil Procedure 19(a). The Magistrate concluded that even if Moore was correct that Geissal had no claim for compensatory damages because Aetna paid all of the medical bills, Geissal could seek statutory damages under 29 U. S. C. § 1132(a)(1).[3] The Magistrate held that Aetna was not a necessary party to the suit, since complete relief could be granted between Moore and Geissal without joining Aetna, a verdict in Geissal's favor would not subject Moore to the risk of inconsistent or double obligations, and Aetna's joinder was not necessary to determine primacy as between the two plans.

The Magistrate denied summary judgment for Geissal, however, and instead *sua sponte* granted partial summary judgment on Counts I and II in favor of Moore, concluding that an employee with coverage under another group health

[2] Pursuant to 28 U. S. C. § 636(c), the parties agreed to have a magistrate judge conduct all proceedings in this case.

[3] This subsection provides that a beneficiary may seek relief under 29 U. S. C. § 1132(c), which provides that a plan administrator who fails to comply with a beneficiary's request for plan information within 30 days of the request is personally liable to that beneficiary in the amount of up to $100 a day from the date of the failure.

Before us, Moore suggests that Geissal lacks standing to maintain this suit. They assert that Aetna has paid all of the medical bills, and that the only apparent difference between the Aetna and Moore policies was a $350 difference in their respective deductibles, a difference far exceeded by the premiums Geissal would owe for COBRA coverage if successful. Despite Moore's assertions to the contrary, however, nothing in the record indicates one way or another whether Aetna has fully reimbursed Geissal for James Geissal's medical bills. Geissal's counsel represented at oral argument that at a minimum there are unpaid medical bills incurred on a trip to the Greek Islands. Quite apart from this, we cannot tell from the record whether Geissal may be entitled to recover from Moore even if sometime later Aetna would have a claim against Geissal to recover the insurance costs that it paid.

plan as of the date he elects COBRA continuation coverage is ineligible for COBRA coverage under § 1162(2)(D)(i), and that James Geissal presented insufficient evidence of detrimental reliance on Moore's representation that he was entitled to benefits under COBRA. The Magistrate also found that there was no significant difference between the terms of coverage under Aetna's plan and Moore's; they differed only in the amount of their respective deductibles, and there was no evidence that Aetna's plan excluded or limited coverage for James Geissal's condition.

The Magistrate then granted Geissal's unopposed motion under Federal Rule of Civil Procedure 54(b) for the entry of final judgment on Counts I and II, and so enabled Geissal to seek immediate review of the Magistrate's decision. The Court of Appeals for the Eighth Circuit affirmed, 114 F. 3d 1458 (1997), and we granted certiorari, 522 U. S. 1086 (1998), to resolve a conflict among the Circuits on whether an employer may deny COBRA continuation coverage under its health plan to an otherwise eligible beneficiary covered under another group health plan at the time he elects coverage under COBRA.[4]

## II

### A

The Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99–272, 100 Stat. 82, 222–237, amended the Employee Retirement Income Security Act, among other stat-

---

[4] Compare *Lutheran Hosp., Inc.* v. *Business Men's Assurance Co.,* 51 F. 3d 1308 (CA7 1995) (an employer may not cease providing COBRA continuation coverage under its plan merely because its former employee has pre-existing coverage under another group health plan), and *Oakley* v. *City of Longmont,* 890 F. 2d 1128 (CA10 1989) (same), cert. denied, 494 U. S. 1082 (1990), with *National Cos. Health Benefit Plan* v. *St. Joseph's Hosp., Inc.,* 929 F. 2d 1558 (CA11 1991) (an employer may suspend the COBRA continuation coverage of a former employee who had pre-existing coverage under another group health plan), and *Brock* v. *Primedica, Inc.,* 904 F. 2d 295 (CA5 1990) (same).

utes. The amendments to ERISA require an employer[5] who sponsors a group health plan to give the plan's "qualified beneficiaries" the opportunity to elect "continuation coverage" under the plan when the beneficiaries might otherwise lose coverage upon the occurrence of certain "qualifying events," including the death of the covered employee, the termination of the covered employee's employment (except in cases of gross misconduct), and divorce or legal separation from the covered employee. 29 U. S. C. § 1163. Thus, a "qualified beneficiary" entitled to make a COBRA election may be a "covered employee" (someone covered by the employer's plan because of his own employment), or a covered employee's spouse or dependent child who was covered by the plan prior to the occurrence of the "qualifying event." § 1167(3).

COBRA demands that the continuation coverage offered to qualified beneficiaries be identical to what the plan provides to plan beneficiaries who have not suffered a qualifying event. § 1162(1). The statute requires plans to advise beneficiaries of their rights under COBRA both at the commencement of coverage and within 14 days of learning of a qualifying event,[6] § 1166(a), after which qualified beneficiaries have 60 days to elect continuation coverage, § 1165(1). If a qualified beneficiary makes a COBRA election, continuation coverage dates from the qualifying event, and when the event is termination or reduced hours, the maximum period of coverage is generally 18 months; in other cases, it is generally 36. § 1162(2)(A). The beneficiary who makes the election must pay for what he gets, however, up to 102 percent of the "applicable premium" for the first 18 months of continuation coverage, and up to 150 percent thereafter. § 1162(3).

---

[5] Employers with fewer than 20 employees are exempt from COBRA's requirements. 29 U. S. C. § 1161(b).

[6] Under § 1166(a)(2), an employer has a duty to report most qualifying events, including the termination of employment, to its group health plan administrator within 30 days of the qualifying event.

The "applicable premium" is usually the cost to the plan of providing continuation coverage, regardless of who usually pays for the insurance benefit. § 1164. Benefits may cease if the qualified beneficiary fails to pay the premiums, § 1162(2)(C), and an employer may terminate it for certain other reasons, such as discontinuance of the group health plan entirely, § 1162(2)(B). COBRA coverage may also cease on

"[t]he date on which the qualified beneficiary first becomes, after the date of the election—

"(i) covered under any other group health plan (as an employee or otherwise), which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary, or

"(ii) entitled to benefits under title XVIII of the Social Security Act." § 1162(2)(D).[7]

---

[7] When originally enacted, § 1162(2)(D)(i) provided that coverage could cease when a qualified beneficiary "first becomes, after the date of the election . . . a covered employee under any other group health plan," and a separate provision, § 1162(E), provided that in the case of an individual who was a qualified beneficiary as the result of being a spouse of a covered employee, coverage could cease on "the date on which the beneficiary remarries and becomes covered under a group health plan." COBRA, Pub. L. 99–272, 100 Stat. 228. Congress later struck § 1162(E) and amended subsection (i) to provide that coverage could cease when a qualified beneficiary "first becomes, after the date of the election . . . covered under any other group health plan (as an employee or otherwise)." Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2938–2939. Congress again amended subsection (i) in 1989, when it added the qualification, "which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary." Omnibus Budget Reconciliation Act of 1989, Pub. L. 101–239, 103 Stat. 2297, 2432. The Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191, 110 Stat. 2087–2088, amended § 1162(2)(D)(i) yet again by inserting before ", or": "(other than such an exclusion or limitation which does not apply to (or is satisfied by) such beneficiary by reason of chapter 100 of the Internal Revenue Code of 1986, part 7 of subtitle B of title I of the Employee Retirement Income Security Act of 1974, or title XXVII of this Act)." The 1996 amendment was not in effect at the time this case arose.

## B

Moore, like the Magistrate, believes that James Geissal's coverage under the TWA plan defeats the claim for COBRA coverage after his election to receive it. As Moore reads § 1162(2)(D)(i), it is not relevant when a qualified beneficiary first obtains other health insurance coverage; instead, Moore submits, all that matters is whether, at any time after the date of election, the beneficiary is covered by another group health plan. In any event, Moore claims, James Geissal first became covered under the TWA plan only after his COBRA election, because it was only at that moment that his TWA coverage became primary.

Moore's reading, however, will not square with the text. Section 1162(2)(D)(i) does not provide that the employer is excused if the beneficiary "is" covered or "remains" covered on or after the date of the election. Nothing in § 1162(2)(D)(i) says anything about the hierarchy of policy obligations, or otherwise suggests that it might matter whether the coverage of another group health plan is primary. So far as this case is concerned, what is crucial is that § 1162(2)(D)(i) does not speak in terms of "coverage" that might exist or continue; it speaks in terms of an event, the event of "becom[ing] covered." This event is significant only if it occurs, and "first" occurs, at a time "after the date of the election." It is undisputed that both before and after James Geissal elected COBRA continuation coverage he was continuously a beneficiary of TWA's group health plan. Because he was thus covered before he made his COBRA election, and so did not "first become" covered under the TWA plan after the date of election, Moore could not cut off his COBRA coverage under the plain meaning of § 1162(2)(D)(i).

Moore argues, to the contrary, that there is a reasonable sense in which a beneficiary does "first becom[e]" covered under a pre-existing plan "after the date of the election," even when prior coverage can be said to persist after the election date: the first moment of coverage on the day follow-

ing the election is the moment of first being covered after the date of the election. See *National Cos. Health Benefit Plan* v. *St. Joseph's Hosp., Inc.*, 929 F. 2d 1558, 1570 (CA11 1991) ("[I]t is immaterial when the employee acquires other group health coverage; the only relevant question is when, after the election date, does that other coverage take effect. In the case of an employee covered by preexisting group health coverage, . . . the first time after the election date that the employee becomes covered by a group health plan other than the employer's plan is the moment after the election date"). But that reading ignores the condition that the beneficiary must "first becom[e]" covered after election, robbing the modifier "first" of any consequence, thereby equating "first becomes . . . covered" with "remains covered." It transforms the novelty of becoming covered for the first time into the continuity of remaining covered over time.

Moore argues, further, that even if our reading of the statute is more faithful to its plain language, Congress could not have meant to give a qualified beneficiary something more than the right to preserve the status quo as of the date of the qualifying event.[8] Moore points out that if the phrase "first becomes covered . . . after" the date of election does not apply to any coverage predating election, then the beneficiary is quite free to claim continuation coverage even if he has obtained entirely new group coverage between the qualifying event and the election; in that case, on our reading, COBRA would not be preserving the circumstances as of the date of the qualifying event.

---

[8] Moore also argues that Congress could not have intended to render COBRA eligible those individuals with pre-existing coverage under another health plan at the time of election, because such individuals who in fact elect COBRA coverage are typically high risk. As a result, Moore contends, covering them under COBRA tends to increase an employer's overall cost of providing a group health plan, and may cause some employers to cease offering a group health plan entirely. This may or may not be true. If substantiated, the argument would be considered in construing the scope of a vague provision; § 1162(2)(D)(i), however, is not vague.

84

That the plain reading does not confine COBRA strictly to guardianship of the status quo is, of course, perfectly true, though it is much less certain whether this fact should count against the plain reading (even assuming that the obvious reading would be vulnerable to such an objection, see *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991)). The statute is neither cast expressly in terms of the status quo, nor does it speak to the status quo on the date of the qualifying event except with reference to the coverage subject to election. Nor does a beneficiary's decision to take advantage of another group policy not previously in effect carry any indicia of the sort of windfall Congress presumably would have disapproved. Since the beneficiary has to pay for whatever COBRA coverage he obtains, there is no reason to assume that he will make an election for coverage he does not need, whether he is covered by another policy in place before the qualifying event or one obtained after it but before his election.

Still, it is true that if during the interim between the qualifying event and election a beneficiary gets a new job, say, with health coverage (having no exclusion or limitation for his condition), he will have the benefit of COBRA, whereas he will not have it if his new job and coverage come after the election date. Do we classify this as an anomaly or merely a necessary consequence of the need to draw a line somewhere? For the sake of argument we might call it an anomaly, but that would only balance it against the anomaly of Moore's own position, which defies not only normal language usage but the expectations of common sense: since an election to continue coverage is retroactive to the date of the qualifying event, under Moore's reading of § 1162(2)(D)(i) an election that is ineffective to bring about continuation coverage for the roughly 18 (or 36) month statutory period would nonetheless have the surprising effect of providing continuation coverage for the period of weeks, or even days, between

the event and the election. One wonders why Congress would have wanted to create such a strange scheme. Thus, assuming that our reading of § 1162(2)(D)(i) produces an anomaly, so does Moore's.

But this is not all, for the anomalous consequences of Moore's position are not exhausted without a look at the interpretative morass to which it has led in practice. To support its thesis that Congress meant individuals situated like James Geissal to be ineligible for COBRA benefits, Moore points to a statement in the House Reports on the original COBRA bill, that "[t]he Committee [on Ways and Means] is concerned with reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H. R. Rep. No. 99–241, pt. 1, p. 44 (1985); see 114 F. 3d, at 1463 (quoting House Report). Of course, if this concern (expressed in one House Committee Report) were thought to be a legitimate limit on the meaning of the statute as enacted, there would be no COBRA coverage for any beneficiary who had "any health insurance" on the date of election, or obtained "any" thereafter. But neither Moore nor any court rejecting the plain reading has gone quite so far. Instead, that draconian alternative has been averted by a nontextual compromise.

The compromise apparently alludes to the proviso that § 1162(2)(D)(i) applies so as to authorize termination of COBRA coverage only if the coverage provided by the other group health plan "does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary." Moore urges us to hold, as some Courts of Appeals have done, that although Congress generally intended to deny COBRA coverage to individuals with other group insurance on the election date, there will still be COBRA eligibility in such cases if there is a "significant gap" between the coverage offered by the employer's plan and that offered by

the beneficiary's other group health plan.[9]   See 114 F. 3d, at 1464–1465; accord, *National Cos. Health Benefit Plan* v. *St. Joseph's Hosp., Inc.,* 929 F. 2d, at 1571; *Brock* v. *Primedica, Inc.,* 904 F. 2d 295, 297 (CA5 1990).   When there is such a gap, some courts have explained, it cannot be said that the employee is truly "covered" by his pre-existing insurance coverage.   See 114 F. 3d, at 1463; *National Cos. Health Benefit Plan* v. *St. Joseph's Hosp., Inc., supra,* at 1571.

This "significant gap" approach to § 1162(2)(D)(i) is plagued with difficulties, however, beginning with the sheer absence of any statutory support for it.   Section 1162(2)(D)(i) makes no mention of what to do when a person's other coverage is generally inadequate or inferior; instead, it provides merely that coverage under a later acquired group health plan will not terminate COBRA rights when that plan limits or excludes coverage for a pre-existing condition of the beneficiary.   The proviso applies not when there is a "gap" or difference between the respective coverages of the two policies, but when the later acquired group coverage excludes or limits coverage specific to the beneficiary's pre-existing condition.   It is this "gap" between different coverage provisions of the non-COBRA plan, not a gap between the coverage provisions of the COBRA plan and the non-COBRA plan, that Congress was legislating about.

But even leaving textual inadequacy aside, there is further trouble under the "significant gap" approach.   Needless to say, when the proviso (as written) arguably does apply, its applicability is easy to determine.   Once the beneficiary's pre-existing condition is identified, a court need only look among the terms of the later policy for an exclusion or limita-

---

[9] The lower courts have disagreed about whether this "significant gap" interpretation should be made by evaluating the actual expenses an employee incurs as a result of COBRA cancellation, or by comparing the policies' provisions in light of the information available to the employer on the day of the COBRA election.   See 114 F. 3d, at 1464–1465 (comparing approaches).

tion peculiar to that condition. If either is found, COBRA continuation coverage is left undisturbed; if neither is found, the consequence of obtaining this later insurance is automatic. Applying the significant gap rule, on the other hand, requires a very different kind of determination, essentially one of social policy. Once a gap is found, the court must then make a judgment about the adequacy of medical insurance under the later group policy, for this is the essence of any decision about whether the gap between the two regimes of coverage is "significant" enough. This is a powerful point against the gap interpretation for two reasons. First, the required judgment is so far unsuitable for courts that we would expect a clear mandate before inferring that Congress meant to foist it on the judiciary.[10] What is even more strange, however, is that Congress would have meant to inject the courts into the policy arena, evaluating the adequacy of non-COBRA coverage that happened to be in place prior to the COBRA election, while at the same time intending to limit the judicial intrusion, and leave the beneficiary to the unmediated legal consequences of the terms of the non-COBRA coverage that happened to become effective after the election. One just cannot credibly attribute such oddity to congressional intent.

In sum, there is no justification for disparaging the clarity of § 1162(2)(D)(i). The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[10] The unlikelihood, indeed, appears overwhelming when one considers that the same comparison would have to be made when the beneficiary was covered under Medicare, which is treated like a separate group plan for present purposes, see § 1162(2)(D)(ii).