**David O. BEASLEY, Plaintiff,**

v.

**CONOPCO, INC., Defendant.**

**No. CIV.A. 01–A–1524–N.**

United States District Court,
M.D. Alabama,
Northern Division.

July 21, 2003.

Randy Myers, Montgomery, AL, for Plaintiffs.

Walter T. Gilmer, Jr., G. Cameron Pfeiffer, McDowell, Knight, Roedder & Sledge, L.L.C., Mobile, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment and a Motion to Strike filed by the Defendant, Conopco, Inc.

The Plaintiff, David O. Beasley ("Beasley"), originally filed a Complaint in the Circuit Court of Montgomery County. The case was removed to this court by the Defendant on the basis that subject matter jurisdiction exists because the Plaintiff's state law claims are completely preempted by the Employment Retirement Income Security Act ("ERISA"). No motion to remand was filed.[1]

---

1. In his brief, Beasley states that at the time he first learned about the special severance benefits, it appeared that a one-time severance offer had been made, which would not be an ERISA plan. Beasley does not appear to dispute, however, that since the benefits he seeks are actually benefits provided by an employee benefit plan, this dispute is governed by ERISA.

The Plaintiff filed an Amended Complaint in this court alleging a breach of an ERISA plan. The Defendant subsequently filed a Motion to Dismiss, which was denied by this court. The Defendant then filed a Motion for Summary Judgment. In response to the exhaustion arguments raised by the Defendant, the court remanded the case to the plan administrator for a written determination of Beasley's claim.

On February 5, 2003, the chairman of the pension committee, Richard Bergeman ("Bergeman"), denied Beasley's claim. Beasley then filed a motion to re-open this case, which was granted, and a second Amended Complaint.

For the reasons to be discussed, the Motion to Strike is due to be GRANTED in part and DENIED in part, and the Motion for Summary Judgment is due to be GRANTED.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing

there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. FACTS

The submissions of the parties establish the following facts, viewed in a light most favorable to the non-movant:

Beasley was an employee of Bestfoods for over fifteen years. In January 2000, Beasley first became aware that Bestfoods might be taken over by another company. Beasley provides evidence of a press release from Bestfoods dated May 2, 2000 which announced that an offer had been made by Unilever P.L.C. ("Unilever") to

acquire all of the outstanding shares of Bestfoods from stockholders for $66 per share.

Beasley was terminated from employment with Bestfoods in July of 2000. At the time of his termination, he was earning a salary in the mid forty thousand dollar range. Beasley Dep. at page 15. He made a claim for payment under the special severance program. Under this special severance program, salary and benefits would be continued for one year upon a change in control and in the event that an employee loses his or her position. Beasley presents a tape recording of a conference call and argues that during this call Richard Bergeman ("Bergeman"), the Vice President of Human Resources for Bestfoods, stated that there had been a change in control. Therefore, Beasley contends, he was eligible for the special severance plan. Beasley's claim, however, was orally denied. He was not paid under the special severance plan, but was paid under the old severance pay plan, which gave him only one weeks's salary for every year of service.

After his termination, Beasley worked in a job for five or six weeks "throwing newspapers" which he learned about from a friend. *Id.* at page 100. He did not get paid for this work. *Id.* Beasley then went to work with Servpro. *Id.* at page 102. He was employed there for five or six months. *Id.* at page 102–03. He then worked for Brown Printing Company, where he is currently employed. *Id.* at page 103. Beasley characterizes this position as the best job he has found since his termination. *Id.* at page 108. At the time of his deposition, he had made around thirty thousand dollars in the previous year with Brown Printing Company. *Id.* at 104.

According to Conopco, Beasley was not entitled to payment under the special severance program. Conopco argues that there was no tender offer or exchange and that the only change in control was a merger which occurred after Beasley's termination. Conopco points out that the Bestfoods shareholders approved a consensual merger with Unilever on October 2, 2002. Conopco, Inc. is the successor corporation.

## IV. DISCUSSION

Beasley argues that he was improperly denied benefits under the special severance plan under the heightened arbitrary and capricious standard of review of denials of ERISA benefits. Beasley also contends that Conopco should be equitably estopped from denying him benefits. The court will address each of these claims in turn.

### A. Improper Denial of Benefits

#### 1. Applicable Standard

■ Although ERISA does not provide district courts with a standard by which to review benefits decisions by benefit plan administrators, the United States Supreme Court has stated that a denial of benefits is to be "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan...." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In discussing the standard of review, the Court also noted that a purported conflict of interest must be weighed as a factor in determining whether there is an abuse of discretion. *Bruch,* 489 U.S. at 115, 109 S.Ct. 948.

■ In applying *Bruch,* the Eleventh Circuit has developed three standards of review for plan interpretations: (1) de novo review which applies where the plan administrator is not afforded discretion; (2) arbitrary and capricious review where

the plan administrator possesses discretion; and (3) heightened arbitrary and capricious review where the administrator has discretion, but there is also a substantial conflict of interest. *See Marecek v. BellSouth Telecommunications,* 49 F.3d 702, 704 (11th Cir.1995). The Eleventh Circuit has further interpreted *Bruch* to mandate de novo review unless the language of the plan expressly provides the administrator with discretionary authority to make eligibility determinations or to construe the plan's terms. *Moon v. American Home Assurance Co.,* 888 F.2d 86, 88 (11th Cir.1989).

Beasley acknowledges that the administrator of the benefits plan has discretionary authority, but has argued that since the benefits to be paid under the special severance program were paid out of the assets of the employer, there was a conflict of interest. Conopco responds that Beasley has not provided any evidence to support its contention that a conflict of interest exists, and says as the majority of the pension benefits committee was made up of people who are not employees of Conopco, no conflict exists.

Conopco has not cited any authority for its argument that the fact that the committee members were not employees of Conopco means that there was no conflict of interest. In *Yochum v. Barnett Banks, Inc. Severance Pay Plan,* 234 F.3d 541, 544 (11th Cir.2000), the Eleventh Circuit concluded that a conflict of interest triggering heightened arbitrary and capricious review existed where severance benefits were paid out of an employer's assets. The court also noted, however, that "[a]t the same time, members of the Committee are NationsBank employees, and their decision to deny benefits saves NationsBank a large sum of money." *Id.* at 544. From the opinion, however, it appears that the fact that the committee members were employees added to the court's finding

that there was a conflict of interest, but were not necessary to that determination. Immediately prior to this statement by the court is the statement that "[i]n this case, we find that there was a conflict of interest in the benefits decision by the Committee, because severance benefits are paid directly from the coffers of NationsBank, so a decision to award severance benefits would take money directly away from Nations-Bank." *Id.* The court also stated that there were "conflicts" of interest, indicating that the employer of the committee members was a separate conflict. *Id.*

In this case, as it is apparently undisputed that the severance benefits were paid out of the company's assets, the court concludes that the heightened arbitrary and capricious standard of review applies.

■ In *Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1561 (11th Cir.1990), the Eleventh Circuit described the application of the "heightened arbitrary and capricious standard" as follows:

[W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of a fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*See id.* at 1567. Accordingly, the first step is to determine whether the fiduciary's decision was "wrong" from the perspective of *de novo* review. *See id.* at 1566 n. 12 ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from

the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary"). Therefore, the court must first determine whether the plan administrator's interpretation of the plan was correct, before the court examines the effect of self-interest.

### 2. Alleged Breach

■ Beasley has alleged that Conopco breached the following provisions of the special severance program:

(a) An employee will become eligible for plan benefits if a "change in control" occurs and his employment is terminated as described in Subsection (b) below. As used in this plan, "change in control" means the occurrence of any of the following events:

(i) any Person commences a tender offer or exchange offer which, if successful, would result in such Person becoming the "beneficial owner" of at least 15% of the outstanding Voting Securities of the Company; *provided, however,* that the Board shall have the right to delay the date on which a Change in Control shall be deemed to occur pursuant to this clause ..., but in no event beyond the earlier of (a) the date of the public announcement that the Board has determined to recommend, or remain neutral toward, such offer, or (b) the earliest date on which there is a purchase of any Voting Securities of the Company pursuant to such offer; (b) a termination of employment is covered under the plan if it occurs within two years after a change in control...

There is no dispute that Beasley's employment was terminated in July. If the transaction between Bestfoods and Unilever was a merger, it is only considered to be a change in control at the time the merger is approved by the stockholders. *See* Exhibit 5 at 2(a)(iv). There is apparently no dispute that the actual agreement by which Best Foods became a part of

Unilever went into effect in October. Therefore, if the transaction was a merger, the October date is applicable, and Beasley's termination in July preceded the change in control. Only if a tender offer was made prior to July 2000 would Beasley be eligible for the special severance plan.

Conopco presents the affidavit of Mart Laius ("Laius"), Vice President of Conopco, who states that at "no time did any affiliate of Unilever ever commence a tender offer or exchange offer for Bestfoods' stock." Mart Laius Affidavit at page 2. Laius also states that a tender offer or exchange offer requires a very specific filing with the SEC and that Unilever never made such a filing. *Id.*

Conopco also has presented an affidavit from the Associate General Counsel–Litigation of Unilever United States Inc. and Assistant Secretary of Conopco, who states that on June 6, 2000, Bestfoods and Unilever signed a merger agreement that provided that after receipt of regulatory approvals and the positive vote of the shareholders, Bestfoods would become an indirect wholly owned subsidiary of Unilever. Stuart Cobert Affidavit. This agreement was filed with the Securities and Exchange Commission. *Id.* The affidavit also states that on October 2, 2000, the shareholders of Bestfoods voted to approve a resolution providing for the merger of Bestfoods with an indirect subsidiary of Unilever PLC and Unilever NV. *Id.* at page 2. Conopco also points to a June 6, 2000 press release as evidence of a merger, not of a tender offer, which refers to a "definitive merger agreement." *See* Exhibit 13.

In the face of this affirmative evidence that there was no tender offer and, therefore, no change in control before Beasley's termination, Beasley has pointed to a May 2, 2000 public announcement by Bestfoods that an offer previously had been made by

Unilever to acquire the outstanding shares of Best Foods at a particular price. *See* Exhibit 2.[2] Beasley contends that the offer to purchase the shares was a tender offer.

Beasley argues that the term "tender offer" is ambiguous. Beasley relies on a decision from another jurisdiction which set out some characteristics of a tender offer. *See Clearfield Bank & Trust v. Omega Financial Corp.,* 65 F.Supp.2d 325 (W.D.Pa.1999). Those factors include active and widespread solicitation of public shareholders for the shares of the issuer, solicitation made for a substantial percentage of the issuer's stock, offer to purchase made at a premium over the prevailing market price, terms of the offer firm rather than negotiable, offer contingent on the tender of a fixed number of shares, offer open only a limited period of time, offeree subjected to pressure to sell his stock, and public announcement of the purchasing program concerning the target company.

Beasley contends that while there is no consensus on the meaning of "tender offer," there is general agreement that a tender offer involves a public invitation to a corporation's shareholders to purchase their stock for a specified consideration. He also states that there is no clear consensus that a tender offer must be a hostile bid opposed by incumbent management. Of course, the tender offer provision in the special severance program at issue is consistent with Beasley's position, as it contemplates that a tender offer or exchange can occur where the Board of Directors has agreed to, or decided to remain neutral as to, the offer.

Beasley's contention that a tender offer is at least characterized by a direct solicitation of shareholders is consistent with the idea, expressed by commentators, that the mechanics of a typical tender offer are that the offeror publicly proposes to buy a certain percentage of outstanding securities, usually through newspaper advertisements inviting current shareholders to tender their stock. *See, e.g.,* Note, *Cash Tender Offers,* 83 Harv. L.Rev. 377, 377–78 (1969).

Beasley states in his brief that the offer was made public to all shareholders, but the only evidence cited to support this statement appears to be the press release issued by Best Foods, the target company. The press release pointed to by Beasley, therefore, merely establishes that an offer to purchase shares was made to the Board of Directors of Best Foods, which rejected that offer, and made public its rejection. There is no evidence that an offer was made to the shareholders directly. In fact, Beasley stated in his deposition that no one offered to buy shares of stock from him and he does not know anybody that Unilever approached directly about buying stock. Beasley Deposition at page 122.

The court finds no legal, or logical basis, for concluding that the target company making public a rejection of a private offer converts that offer into a public solicitation. This is particularly true in this case, where the letter from Unilever to Bestfoods which included the offer to purchase the outstanding shares states that it retains the right to withdraw from the proposal if any unauthorized disclosures are made. *See* Defendant's Exhibit 22.

---

**2.** Conopco points out that in various stages of his litigation, and in his most recent Amended Complaint, Beasley points to a June 6 date as the date of the tender offer. To the extent that Beasley had earlier advanced such an argument, his failure to do so in opposition to the most recent motion for summary judg-ment is taken by this court to be an abandonment of that argument. *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir.1994)(stating that grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned).

In light of the evidence presented, the court need not decide what the definition of a tender offer is, or should be, in this case, because under any formulation of that definition, including Beasley's, there must be a solicitation of the shareholders by the company making the tender offer. Even viewing the evidence in the light most favorable to the non-movant, the court must conclude that Beasley has not sufficiently established that there was solicitation by Unilever of the shareholders to tender their shares. As Conopco's evidence that there was no tender offer, but instead that there was a merger, is unrebutted, there was no breach of the special severance plan when Beasley was denied coverage under that special provision and the plan administrator's interpretation is correct. The court, therefore, need not address the issue of the self-interest of the Committee. Summary judgment is due to be GRANTED on this claim.

### B. Equitable Estoppel

■ Conopco argues that estoppel cannot be used to change the terms of an ERISA agreement. *See Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285 (11th Cir. 1990). In *Kane,* the Eleventh Circuit held that the federal common law of equitable estoppel is not available to plaintiffs in cases involving oral amendments to, or modifications of, employee plans governed by ERISA, because ERISA specifically addresses these issues. *Id.* Equitable estoppel can, however, be applied where there was an interpretation of an ambiguous provision of the plan. *Id.* at 1285 n. 3. Beasley argues that because "tender offer" is not defined in the special severance plan, it is an ambiguous term, and estoppel can apply.

Beasley argues that Conopco should be estopped from denying him payment under the Special Severance Plan because Bergeman told him that he would be entitled to payment under that plan. During a phone conference conducted with employees, Bergeman was asked about the special severance plan, and he described the plan as having two triggers: a change in control and a loss of position. The court has listened to the tape and agrees that Bergeman states that one of the triggers "has already happened." He states that there has been a change in control. After Bergeman finishes speaking, however, Bestfoods CEO and Chairman, Dick Shoemate, says the trigger has "already happened" to the extent that they have agreed to it, but the actual event requires regulatory approval and other steps which will take three, four, or five months. Beasley also points out that Bergeman stated in his deposition that he would expect employees to rely on company management to explain when a change of control had occurred. *See* Bergeman Depo. at page 30.

While Conopco disputes that any representation about change in control was made, arguing that Shoemate's comments undermine Beasley's claim, Conopco argues more fundamentally that to prove estoppel, there must be reasonable detrimental reliance, which Beasley has failed to show. *See Liberty Mut. Fire Ins. Co. v. Parish,* 630 So.2d 437, 439 (Ala.1993)(stating that "detrimental reliance is a critical element of estoppel"); *Kane,* 893 F.2d at 1286 (noting that the plaintiff had incurred substantial expense as a result of the plan interpretation).

The evidence of reliance Beasley has pointed to is in his affidavit where he states that in reliance on Bergeman's representation, he did not look for another job, and had he known the truth, he would have looked for and accepted a job with similar pay and benefits. Beasley Affidavit at page 2, ¶ 3.

Beasley's evidence is the subject of a Motion to Strike filed by Conopco. The court, therefore, will separately address

that motion and the issue of detrimental reliance.

### 1. Motion to Strike

Conopco argues that the portion of Beasley's affidavit which states that he would have looked for and accepted other employment is in direct conflict with Beasley's deposition testimony that he would not have quit his job, and should not be considered by this court.

 In this circuit, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984). Therefore, before disregarding an affidavit or declaration, a court must find some inherent inconsistency between the affidavit and deposition. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir.1987).

 In his deposition, Beasley testified as follows:

Q. And I think what you testified to earlier, Mr. Beasley, was you weren't worried about anything happening to your job immediately or in the foreseeable future; right?

A. Right.

Q. And you weren't going to quit your job at Bestfoods?

A. No, I didn't . . .

Q. In fact, if you'd ever quit your job, you would have forfeited your nineteen weeks of severance. You weren't going to do that, were you? A I thought I had a job, and, and, no, I wasn't going to quit my job and forfeit it, whatever.

\* \* \* \* \* \*

Q. Now, let me ask you this. If Mr. Bergeman had never said anything in that telephone conference about special severance pay, you weren't going to quit your job at Bestfoods anyway, were you?

A. No, I wasn't going to quit my job with Bestfoods.

Beasley Depo. at pages 152–53; 199: 18–23.

In his affidavit, Beasley states that when he was asked in his deposition whether he was going to quit his job, he answered no, but that if he had not received the assurance of the special severance program, he would have begun to look for another job and would have taken a job with similar pay and benefits, given the uncertainty of his future with the company. Beasley Affidavit at page 2.

In response to this court's order giving Beasley an opportunity to respond to the Motion to Strike, Beasley states that his affidavit is not inconsistent with his deposition testimony because at the time the announcement was made that the Board of Directors had approved the sale of BestFoods, he did not plan to quit his job that day, but that if he had not been assured of eligibility for the special severance package, he would have begun to look for a job and accepted another job if it was similar. *Id.* Beasley then goes on to state that he would not have quit that day, but would have waited to secure other employment. *Id.*

Beasley's explanation, therefore, is that he would have sought other employment, but for the fact that Bergeman made the representation as to the severance plan, and that when he said he would not have quit his position, he only meant that he would not have quit on that day, but would have waited until he found other similar employment.

Beasley also states in his affidavit that he would have taken a similar job because of the uncertainty of his continued employ-

ment with Unilever. Beasley Affidavit at page 2. As stated earlier, however, in his deposition he agreed that he was not worried about anything happening to his job immediately or in the foreseeable future and he was not going to quit his job. Beasley offers no explanation for this particular conflict. The court concludes, therefore, that the affidavit statement that he would have accepted other employment due to the uncertainty regarding his employment is due to be stricken.

The affidavit statement that Beasley would have quit his job had he found something similar also appears to be in conflict with his statement that he would not have forfeited his nineteen weeks of severance benefit by quitting his job. In his affidavit, Beasley states that he did not consider forfeiting his nineteen weeks because he was assured he was entitled to the special severance program. Affidavit at page 2. Accepting this explanation, therefore, Beasley meant that he was not concerned about forfeiting his nineteen weeks of severance pay, because he would have received severance under the special severance program.

Although Conopco disputes that Beasley has adequately distinguished his affidavit testimony from his testimony in his deposition, and the court agrees that Beasley is drawing a fine distinction by stating that when he said he was not going to quit his job, he meant only that he was not going to quit it the day he learned the Board had agreed to sell the company, the court must conclude that, accepting Beasley's interpretation of his testimony, the affidavit testimony must be considered, except for the statement regarding the uncertainty of his future. The court, therefore, turns to the issue of reasonable detrimental reliance, which is based on this evidence.

### 2. Detrimental Reliance

■ Under the doctrine of equitable estoppel, the party claiming estoppel must demonstrate that (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation. *National Companies Health Ben. Plan v. St. Joseph's Hosp. of Atlanta, Inc.*, 929 F.2d 1558, 1572 (11th Cir.1991), *abrogated on other grounds by, Geissal v. Moore Medical Corp.*, 524 U.S. 74, 118 S.Ct. 1869, 141 L.Ed.2d 64 (1998); *see also Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

In his affidavit, Beasley states that because he was told that he was eligible for the special severance program, which would have entitled him to salary and benefits for a year, he did not look for other employment, and that had he known the truth, he would have sought **and accepted** similar employment elsewhere. In other words, in reliance on his understanding that he would be entitled to salary and benefits for a year upon his termination, he did not seek and accept similar employment, but remained employed with Best-Foods.

First, if Beasley's argument is that he relied on the availability of the special severance benefit in deciding that he should not seek other employment, that argument does not establish reasonable reliance. The alleged representation at issue for this claim is the availability of a severance benefit, not Beasley's continued employment. The very fact that the benefit was a severance benefit meant that Beasley knew that if the event entitling

him to that benefit occurred, that is, his termination, he would need other employment.[3] Further, to show that he relied on the availability of the special severance program, Beasley would have to establish some reason why the special severance benefit itself, rather than the mere fact that he would be entitled to some special severance benefit, caused him to fail to look for other employment. Beasley, however, does not state that he placed any reliance on the difference between the nineteen weeks of severance pay provided by the old severance plan, and the year provided by the special severance program, or any other difference between the two plans, in deciding not to look for and accept other employment. Therefore, the court cannot conclude that Beasley has demonstrated that he reasonably relied on a representation about the availability of the special severance program in deciding to remain in his employment with Bestfoods and not to seek and accept similar employment.

Assuming for purposes of argument, however, that Beasley could articulate some reasonable reliance on a difference between the two plans in deciding not to seek and accept other employment, he still must establish that his failure to seek and accept other employment resulted in a detriment. By allegedly relying on the representation, he remained in his job and received a severance benefit. Therefore, it would seem that he suffered no detriment by remaining in his job and ultimately receiving a severance benefit, rather than foregoing the severance benefit by seeking and accepting other employment.

In response to the Motion to Strike, however, Beasley appears to assert a new detrimental reliance argument, which was also asserted at the pre-trial conference held in this case. He states that in reliance on Bergeman's representation, he did not look for employment, and, therefore, suffered a gap between his Bestfoods employment and his new position. Beasley cites to a portion of his deposition wherein he states that he did not find new employment for one and one half months after his termination.[4]

Beasley's affidavit states that had he looked for and found similar employment, he would have accepted it. Although the affidavit is clear that Beasley means he would have accepted other employment while employed with Bestfoods, this court will assume for purposes of argument that his affidavit could be read to say that he would have looked for, but not accepted other employment until after he was terminated from Bestfoods, thereby entitling him to a severance benefit from Bestfoods and salary and benefits from the new position upon his termination from Bestfoods.

Conopco argues that Beasley has not presented any evidence that another job was available at the time of his termination, and that his mere speculation does not establish detrimental reliance. Conopco relies on state and federal cases for the proposition that speculation about subse-

---

3. Beasley would not have been eligible for severance under the old severance plan had he voluntarily resigned. *See* Exhibit C. Under the special severance program, he would have received a severance benefit if his termination were instigated by the Employer, or were voluntarily made by the employee because his employment conditions adversely changed, such as requiring geographic relocation or imposing a position of lesser status, responsibility, or compensation. Defendant's Exhibit

3. There is no evidence that Beasley's position had changed. As stated earlier, he stated in his deposition that he did think anything would happen to his job immediately or in the foreseeable future.

4. Of course, he received severance benefits during this period of unemployment, as the plan under which he was paid covered him for nineteen weeks.

quent employment does not establish reasonable detrimental reliance.

In *Webb v. Pioneer Ins. Co.*, 56 Ala.App. 484, 323 So.2d 373 (Ala.Civ.App.1975), the court rejected the application of estoppel where a plaintiff testified that his only reliance was that he would have participated more strenuously in salary negotiations with his new employer. The court reasoned that this conduct was too speculative under the circumstances of the case for the imposition of estoppel. *Id.* at 488–89, 323 So.2d 373. Similarly, in *Panzino v. Scott Paper Co.*, 685 F.Supp. 458, 461 (D.N.J. 1988), an estoppel claim based on a representation that an employee would not lose his job was rejected where the plaintiff testified that he would have sought employment elsewhere, but the plaintiff had no assurance of employment elsewhere, and was not sure which companies had job openings at the time.

In this case, there is no evidence of any jobs with similar pay and benefits which would have been available at the time of his termination. At the pre-trial conference held in this case, the attorney for Beasley pointed out that his employment gap was a month a half, while the time period between the representation made about the severance benefits and his termination was two months. There is, however, no evidence before the court to establish that the Servpro position he obtained a month and a half after his termination was available at the time of his termination, or at any point during the two month period between the representation and his termination. For this court to conclude, therefore, that employment similar in pay and benefits would have been available immediately upon his termination would be speculation. As Conopco points out, the only evidence of a position available upon

his termination is a position dealing with delivery of newspapers for which he was never paid. Beasley has not demonstrated, therefore, that his reliance on Bergeman's representation caused a detriment in the form of a gap in his employment.

Accordingly, even assuming that estoppel could be applied in this case, this court must agree that Beasley has failed to establish the elements of equitable estoppel. Although it may have been understandable that Beasley felt, based on Bergeman's statements, that his termination would be considered to have occurred after a change in control under the special severance plan, without evidence of reasonable detrimental reliance on those statements, the court cannot conclude that Bergeman's statements preclude Conopco from asserting that a change in control had not yet occurred at the time that Beasley was terminated.[5] Summary judgment is, therefore, due to be GRANTED as to this claim.

## V. CONCLUSION

For the reasons discussed above, it is hereby ORDERED as follows:

1. Conopco's Motion to Strike is GRANTED as to any reference in David O. Beasley's Affidavit as to his statement that he would have accepted other employment due to the uncertain nature of his continued employment. The Motion to Strike is DENIED in all other respects.

2. Conopco's Motion for Summary Judgment is GRANTED. A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.

### FINAL JUDGMENT

In accordance with the Order entered on this day granting the Defendant's Motion for Summary Judgment,

---

5. Conopco also asserts that Beasley failed to exhaust available administrative remedies. This contention was, however, addressed in this court's previous opinion in this case. *See* Doc. # 38.

Judgment is hereby entered in favor of Conopco, Inc. and against David O. Beasley.

Costs are taxed against the Plaintiff, David O. Beasley.