**Danny B. BALLARD, Plaintiff,**

v.

**VULCAN MATERIALS COMPANY, Defendant.**

No. 95–2868 M1/V.

United States District Court, W.D. Tennessee, Western Division.

July 21, 1997.

Jeffery D. Parrish, Borod & Kramer, Memphis, TN, for Plaintiff.

Frederick J. Lewis, Rhonda M. Taylor, McKnight Hudson Lewis Ford & Harrison, Memphis, TN, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McCALLA, District Judge.

This matter is before the Court on defendant's motion for summary judgment, filed April 25, 1997. For the reasons set forth below, defendant's motion is GRANTED, and this case is DISMISSED WITH PREJUDICE.

### BACKGROUND

Viewing the facts in the light most favorable to the plaintiff, as the Court must do in considering a defendant's motion for summary judgment, the relevant facts are as follows:

Plaintiff, Danny B. Ballard, began his employment as a boat pilot in 1978 at defendant's President's Island Yard in Memphis, Tennessee. Plaintiff worked as a boat pilot for defendant until June 1994, when he was terminated. Wallace Wilbourn was defendant's yard supervisor and plaintiff's immediate supervisor during all periods relevant to this suit. Clyde Mauk was defendant's manager of transportation and Wilbourn's immediate supervisor during all periods relevant to this suit.

In approximately 1985, plaintiff began to work ten (10) hours per day, seven (7) days per week, resulting in a work week of seventy (70) hours. Plaintiff continued to work these seventy hour weeks through the duration of his employment. According to plaintiff, working seven days per week did not bother him until sometime in 1990. At about that time, plaintiff's first marriage ended in divorce. Plaintiff attributed much of the reason for the failure of his marriage to the number of hours that he was required to work. In addition, plaintiff testified that his work schedule prevented him from being able to "take care of business," renew his automobile registration, play golf, get a haircut, fish, or spend time with his children and family. Plaintiff also asserts that it was about this time that he first began experiencing the effects of dysthymia, though still undiagnosed at that time.

In March 1994, plaintiff began to suffer from "stress" and "burnout" and utilized defendant's Behavioral Health Plan. Under the Plan, plaintiff was referred to Dr. Robert Fink, a psychiatrist, by Personal Performance Consultants, the third-party contractor authorized to make such referrals. Plaintiff's first appointment with Dr. Fink was on April 7, 1994.

On April 25, 1994, plaintiff presented to Wilbourn a letter from Dr. Fink, dated April 11, 1994, which stated that plaintiff suffered

from "situational stress" and would benefit from a reduction in work hours from seventy (70) hours per week to fifty (50) hours per week. Dr. Fink's letter, however, went on to state, "There is nothing in [plaintiff's] present medical/psychiatric condition that would indicate that he could not function effectively and safely in his usual job performance." Moreover, Dr. Fink's letter did not state that any medication had been or would be prescribed.

With the exception of this one letter from Dr. Fink, plaintiff never provided defendant with any further correspondence or medical certification from Dr. Fink or from any other health care provider. Moreover, plaintiff was never hospitalized for any of his alleged mental or emotional problems.

At the same time that he presented the letter to Wilbourn, plaintiff alleges that he informed Wilbourn that he could continue to work seventy (70) hours per week but would need to take anti-depressant medication in order to do so. Plaintiff alleges that Wilbourn informed him that he could not work if he continued to take the medication.

On May 2, 1994, plaintiff was placed on a sixty (60) day temporary leave and was informed that if he were willing to return to his former schedule—i.e., ten hours per day, seven days per week—he could return to work. Plaintiff was also informed that he would be permitted to retain his health insurance with defendant during his temporary layoff, provided that he pay the employee's portion of the insurance premium. Plaintiff paid the premium and his coverage was continued during the sixty day temporary layoff. During this sixty day layoff, plaintiff applied for and received unemployment benefits.

On June 30, 1994, one day prior to the expiration of the sixty day temporary layoff, plaintiff contacted defendant to inquire about his position with the company. According to plaintiff's deposition testimony, the conversation with Mauk went as follows:

Q: Now, what did you and Mr. [Mauk] talk about? Give me the conversation as best as you can recall it.

A: I had told Mr. [Mauk], well, I'm—this is the 59th day. That I'm just calling to see where am I supposed to report to tomorrow and so forth, et cetera. And he said, well, Danny, we don't have no job for you. Your job has been filled. I said, what do you mean? He says, you couldn't work the 70 hours a week so we didn't need you any longer. He said if I could work 70 hours a week, my job would be available. But until then my job had been filled and that there wasn't a place in Vulcan's organization for a 50–hour–a–week employee.

Q: What did you say?

A: I said, okay. Thank you.

Q: Do you recall anything more that was said by either you or Mr. [Mauk] during this conversation?

A: No, sir.

Q: Did you tell Mr. [Mauk] that you would be willing to come back and work the hours that you had normally working at Vulcan?

A: No, sir.

Q: Would you have been willing to come back and do that at that point?

A: No, sir.

Q: Not even after 59 or whatever number of days off?

A: No, sir.

Pl. Dep. at 143 1. 2—144 1. 8. Despite this conversation, plaintiff asserts that no one at Vulcan ever told him that he was terminated.

On July 5, 1994, however, plaintiff began employment with Memphis Marine Company as a boat pilot. Plaintiff has been continuously employed by Memphis Marine Company since that date. At Memphis Marine Company, plaintiff works twelve (12) hour shifts four (4) days per week.

On August 10, 1994, defendant sent plaintiff notice informing him that his health insurance had terminated but that, pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161–69, he had the option of continuing his health insurance coverage for a period of eighteen (18) months by paying the full premium. On August 24, 1994, plaintiff signed the space on the notification form which stat-

ed, "I do not wish to continue my group health coverage under ERISA" and returned the form to defendant.

On August 30, 1994, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation and discrimination on the basis of disability. In connection with the EEOC charge, plaintiff submitted to the EEOC an "Information Form" in which he described his disability as "stress and burnout." On August 17, 1995, the EEOC issued plaintiff a right to sue letter.

On November 1, 1995, plaintiff filed this action against defendant, alleging seven causes of action: (1) failure to provide reasonable accommodation and discriminatory discharge in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; (2) failure to provide "medically necessary reduced leave" for a "serious health condition" in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2612, 2614, and 2615; (3) interference with protected rights in violation of Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1140 *et seq.;* (4) failure to provide continuation health insurance coverage in violation of COBRA, 29 U.S.C. §§ 1161–69; (5) negligent misrepresentation; (6) promissory estoppel; and (7) deceit. On April 5, 1996, defendant filed a motion for summary judgment as to each of plaintiff's claims; on May 8, 1996, plaintiff filed a response in opposition to that motion. On September 6, 1996, plaintiff filed a motion to amend his complaint, in which he sought to add a claim under the ADA based on a perceived disability. By Order dated December 9, 1996, the Court granted plaintiff's motion to amend. On December 20, 1996, the Court granted defendant's motion to dismiss in part, dismissing all of plaintiff's claims except for his claim under the ADA based on a perceived disability and for the denial of benefits under COBRA.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *id.* at 323, 106 S.Ct. at 2553, and the nonmoving party is unable to make such a showing, summary judgment is appropriate, *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986).

Pursuant to Rule 56(e), when confronted with a properly supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." A genuine issue of material fact exists "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

### *Plaintiff's Claim Under the ADA*

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) he suffers from a disability as defined by the ADA; (2) he is otherwise qualified to perform the job; and (3) he was discharged because of that disability. *See Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1179 (6th

Cir.1996). Thus, the threshold issue in any ADA case is whether plaintiff is disabled as defined by the Act.

■ The ADA defines disability as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). By previous order, this Court found that plaintiff was not disabled as defined by § 12102(2)(A) or § 12102(2)(B); accordingly, the sole issue before the Court is whether defendant regarded plaintiff as having a physical or mental impairment that substantially limited his major life activity of working.

■ In order for plaintiff to show that defendant regarded him as substantially limited in the major life activity of working, plaintiff must show that defendant regarded him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). In making this determination, the Court should consider:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills and abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. 1630.2(j)(3)(ii). At all times, including in response to a motion for summary judgment, the plaintiff bears the burden of establishing that his disability significantly restricted his ability to perform "either a class of jobs or a broad range of jobs in various classes." *McKay v. Toyota Motor Manufacturing,* 110 F.3d 369, 372 (6th Cir. 1997).

Plaintiff argues that defendant regarded him as substantially limited in the major life activity of working because defendant "assumed that this medication might be to the point [where plaintiff] wouldn't be able to operate a towboat or heavy machinery or anything on the river." *Wilbourn Dep.* at 19 l. 20–23. In response, defendant argues that, at worst, it only regarded plaintiff as being unable to work as a boat pilot—i.e., one particular job—and, therefore, plaintiff is not disabled under the applicable regulations and case law. Moreover, defendant argues that plaintiff, by relying solely on Wilbourn's testimony, has failed to come forward with sufficient evidence to withstand a motion for summary judgment. The Court agrees.

■ As noted above, a plaintiff bears the burden of establishing that the defendant regarded him as suffering from a physical or mental impairment that significantly restricted his ability to perform "either a class of jobs or a broad range of jobs in various classes." *McKay,* 110 F.3d at 372. In order to carry this burden, a plaintiff must introduce evidence, expert or otherwise, relating to his vocational skills or training, the geographical area to which he has access, or the number and type of jobs which demand similar training from which he would also be disqualified because of his disability. The failure to introduce such evidence is fatal when faced with a motion for summary judgment. *See Bolton v. Scrivner,* 36 F.3d 939, 943–44 (10th Cir.1994) (affirming award of summary judgment on the grounds that plaintiff had introduced no such evidence); *Soileau v. Guilford of Maine, Inc.* 928 F.Supp. 37, 50–52 (D.Maine 1996) (holding that a plaintiff's failure to provide evidence of general employment demographics is fatal at summary judgment), *aff'd* 105 F.3d 12 (1st Cir.1997); *Howard v. Navistar Int'l Trans.*

*Corp.*, 904 F.Supp. 922, 930 (E.D.Wis.1995) (suggesting that a plaintiff's failure to produce evidence relating to his vocational skills or training, the geographical area to which he has access, or the number and type of jobs which demand similar training from which he would also be disqualified because of his disability is fatal to his case when faced with a motion for summary judgment), *aff'd* 107 F.3d 13 (7th Cir.1997). In this case, plaintiff has failed to produce any such evidence; instead, plaintiff seeks to rely solely on the testimony of Mr. Wilbourn to establish that defendant regarded him as significantly restricted in his "ability to perform either a class of jobs or a broad range of jobs in various classes." Because such evidence is insufficient to allow a reasonable fact finder to conclude that defendant regarded plaintiff as significantly restricted in his ability to perform the major life activity of working, the Court finds that defendant is entitled to judgment as a matter of law.

Moreover, the Court finds that the evidence actually introduced points unmistakably to the conclusion that defendant did not regard plaintiff as substantially limited in his ability to work. By plaintiff's own testimony, plaintiff was told that he could return to work if he would be willing to work seventy hour weeks:

Q: Now, what did you and Mr. [Mauk] talk about? Give me the conversation as best as you can recall it.

A: I had told Mr. [Mauk], well, I'm—this is the 59th day. That I'm just calling to see where am I supposed to report to tomorrow and so forth, et cetera. And he said, well, Danny, we don't have no job for you. Your job has been filled. I said, what do you mean? He says, you couldn't work the 70 hours a week so we didn't need you any longer. He said if I could work 70 hours a week, my job would be available. But until then my job had been filled and that there wasn't a place in Vulcan's organization for a 50–hour–a–week employee.

Q: What did you say?

A: I said, okay. Thank you.

Q: Do you recall anything more that was said by either you or Mr. [Mauk] during this conversation?

A: No, sir.

Q: Did you tell Mr. [Mauk] that you would be willing to come back and work the hours that you had normally working at Vulcan?

A: No, sir.

Q: Would you have been willing to come back and do that at that point?

A: No, sir.

Q: Not even after 59 or whatever number of days off?

A: No, sir.

P1. Dep. at 143 1. 2—144 1. 8. Contrary to plaintiff's assertions,[1] therefore, the fact that plaintiff was told he could return to work if he were willing to work seventy hour weeks indicates that defendant's supervisors did not regard him as having a substantially limiting impairment. *See Gaul v. AT & T, Inc.*, 955 F.Supp. 346, 351 (D.N.J.1997) (holding that an employer did not regard the employee as disabled because it called the employee back from disability leave to work on a special project); *Penchishen v. The Stroh Brewery Co.*, 932 F.Supp. 671, 675 (E.D.Pa.1996) (holding that an employer did not regard an employee with an impaired ankle as disabled where it encouraged her to work in a position that required walking), *aff'd* 116 F.3d 469 (3d Cir.1997). At most, defendant regarded plaintiff as being unable to perform a single category of jobs—i.e., jobs requiring him to work seventy hours per week. As noted

---

1. In its memorandum in opposition to defendant's motion, plaintiff now argues that he could not have returned to work even if he were willing to work a seventy hour week; instead, plaintiff argues that when he voluntarily reported back to work, he was told that his position had been filled. *Pl's Mem. in Opp. to Def.'s Mot. for Summ. J.* at 16. In support of this argument, plaintiff cites only the first eight lines of the testimony set forth above. In doing so, however, plaintiff seeks to avoid his own plain and unambiguous statement immediately following that testimony that his job would be available if he could work seventy hours per week. In this respect, plaintiff's counsel is reminded of its professional and ethical duty of candor toward the Court.

above, the inability to perform a single job or a narrow range of jobs does not render a plaintiff disabled under the ADA. 29 C.F.R. § 1630.2(j)(3)(i). Consequently, the Court finds that defendant is entitled to judgment as a matter of law with respect to plaintiff's claim of perceived disability under the ADA.

### Plaintiff's Claim Under COBRA

▪ Plaintiff next argues that defendant violated COBRA, 29 U.S.C. §§ 1161–69, by failing to provide continuation health insurance coverage after plaintiff allegedly paid the appropriate premium. Under COBRA, group health plans are required to give qualified beneficiaries the option to elect to continue their health coverage when the beneficiary suffers a "qualifying event"—i.e., an event that would cause him to lose coverage under the plan. 29 U.S.C. § 1161(a). When such a qualifying event occurs, the plan administrator is required to notify the qualified beneficiary within fourteen (14) days of his right to continue the coverage at his own expense. 29 U.S.C. § 1166(c). To be entitled to continuation coverage, the beneficiary must elect COBRA coverage within sixty (60) days of the date of the loss of coverage or the date the notice of COBRA rights is sent to the beneficiary, whichever is later. 29 U.S.C. § 1165(1).

▪ In this Court's previous order, the Court denied defendant's motion for summary judgment in part because defendant had argued that the date of the qualifying event was June 30, 1994:

> The notice requirements of 29 U.S.C. § 1166 are clear. Upon termination of an employee, the employer must notify the administrator of the ERISA plan of the employee's termination within thirty days (30) days of the date of termination. 29 U.S.C. § 1166(a)(2). The plan administrator must then notify the employee and any qualified beneficiaries that they are entitled to continue their ERISA health insurance coverage if they are willing to assume the premium payments. 29 U.S.C. § 1166(c). In this case, defendant asserts that the qualifying event occurred on June 30, 1994. According to defendant, it sent notice to plaintiff on August 10, 1994—

forty-one (41) days after the qualifying event. Although this is within the potential forty-four day window for notification allowed under § 1166, defendant has not established that it fully complied with these requirements. For example, if defendant is not the plan administrator, it has not shown that it sent notice to the plan administrator within thirty days of plaintiff's termination. Alternatively, if defendant is the plan administrator, it clearly did not send notice to plaintiff within fourteen days of plaintiff's termination, as required by statute. Accordingly, defendant's motion for summary judgment with respect to plaintiff's claim under COBRA is DENIED.

Defendant now argues that the qualifying event occurred on July 31, 1994, and not on June 30, 1994. According to defendant, therefore, it provided plaintiff with statutory adequate notice. The Court agrees.

Pursuant to 29 U.S.C. § 1163, a qualifying event includes:

> any of the following event which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary:
>
> *    *    *    *    *    *
>
> (2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

29 U.S.C. § 1163. Under a plain reading of the statute, therefore, a reduction in hours or a termination constitutes a qualifying event, and thereby triggers the notice requirement, only when it simultaneously results in a loss of coverage for the qualified beneficiary. *Jachim v. KUTV, Inc.*, 783 F.Supp. 1328 (D.Utah 1992). Thus, if a plan provides for coverage for a specified period of time after the beneficiary's termination or reduction in hours with the same terms and conditions as were in effect during his employment, the notice is required to be sent with fourteen days of the date the coverage expires and not from the date the employee is terminated. *See id.* at 1332.

According to the Comprehensive Medical Plan covering defendant's hourly employees,

employment is deemed to end when the employee ceases active work with the company. *Lockhart Aff.* at ¶ 3. When an employee is placed on temporary layoff, however, the plan provides that coverage can be continued through the end of the second calendar month following the date the employee stopped active work. *Id.* at ¶ 4. In the present case, plaintiff was placed on temporary layoff on May 2, 1994. Because plaintiff was laid off in May, under defendant's plan, he was entitled to and did, in fact, elect to continue his coverage through the end of July 1994. Id. at ¶ 5. Plaintiff, therefore, did not experience a qualifying event until July 31, 1994.

In response, plaintiff argues that there is a genuine issue of material fact as to the date of the qualifying event. According to plaintiff, he did not have coverage under defendant's plan as evidenced by the fact that his long-time pharmacist denied his employer provided insurance card during July 1994. Moreover, plaintiff asserts that he was told by Ann Reed, an employee in defendant's personnel department, that defendant should not have cashed his July premium check. According to plaintiff, therefore, there is a genuine issue of material fact as to when the qualifying event occurred.

Even if plaintiff was denied coverage in July 1994, however, these facts do not support a claim under COBRA. At most, these facts might support a cause of action under § 502(a) of ERISA, based on the wrongful denial of benefits under the provisions of the plan. Thus, plaintiff's argument is unpersuasive.

Accordingly, the Court finds that there is no dispute that the qualifying event occurred on July 31, 1994. Because there is also no dispute that plaintiff was sent notice of his right to continue his coverage under COBRA on August 10, 1994, exactly ten (10) days later, the Court finds that defendant complied with the statutory notice provisions of COBRA. Accordingly, defendant is entitled to judgment as a matter of law.

Alternatively, the Court finds that defendant would still be entitled to summary judgment even if the qualifying event occurred on June 30, 1994. As noted above,

plaintiff does not dispute that his COBRA notice of right to continue coverage was mailed on August 10, 1994, and that he elected not to continue coverage under defendant's plan. When a plaintiff decides not to continue coverage under COBRA, the defendant cannot be held liable for a failure to provide plaintiff with timely notice of his right to continue coverage. *Mercado Garcia v. Ponce Federal Bank,* 779 F.Supp. 620, 631 (D.P.R.1991) (holding that a plaintiff's decision not to continue coverage under COBRA precluded a violation of the notice provisions, regardless of the date the beneficiary received his COBRA notice), *aff'd* 979 F.2d 890 (1st Cir.1992). This rule rests on the fact that when a plaintiff decides not to continue coverage, there are no damages for which defendant can be liable. For example, pursuant to 29 U.S.C. § 1162(2), when a plaintiff properly elects to continue coverage under COBRA, the coverage relates back to the date of the qualifying event in order to ensure that there is no gap in coverage. *See Lincoln General Hosp. v. Nebraska State Educ. Ass'n Health Care Program Plan,* 792 F.Supp. 67 (D.Neb.1991). Thus, had plaintiff elected to continue coverage under COBRA, that coverage would have related back to June 30, 1994 (again assuming that the qualifying event occurred on that date), and plaintiff would have been covered for his medical expenses during that period. By deciding not to continue coverage, however, plaintiff negated any liability, under COBRA, on the part of defendant for those medical expenses. Accordingly, even if the Court were to assume that the qualifying event occurred on June 30, 1994, defendant is still entitled to summary judgment.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is GRANTED. Because this resolves all of the issues in this case, this case is hereby DISMISSED WITH PREJUDICE.