ZURICH AMERICAN INSURANCE COMPANY,
Plaintiff-Respondent-Cross-Appellant,

MICHELS CORPORATION, Involuntary-Plaintiff,

v.

WISCONSIN PHYSICIANS SERVICES
INSURANCE CORPORATION,
Defendant-Appellant-Cross-Respondent.

Court of Appeals

*No. 2006AP2320. Submitted on briefs August 7, 2007.
—Decided November 14, 2007.*

2007 WI App 259

(Also reported in 743 N.W.2d 710.)

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Christine M. Witherill* of *Wisconsin Physicians Services Insurance Corporation*, of Madison.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Beth Ermatinger* and *David J. Turek* of *Gass Weber Mullins LLC*, of Milwaukee.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. WEDEMEYER, J. Wisconsin Physicians Services Insurance Corporation ("WPS") appeals from a summary judgment granted in favor of Zurich Ameri-

can Insurance Company on its subrogation claim. WPS claims that the trial court erred in ruling that WPS must pay Zurich the $350,000 Zurich paid to settle a health insurance dispute. Zurich cross-appeals from the trial court's order denying its request for 12% prejudgment interest and optical imaging costs. Because the trial court did not err in ruling on the issues contained in both the appeal and cross-appeal, we affirm.

## BACKGROUND

¶ 2.　This case involves the medical costs incurred by Troy Beebe, who was employed at Michels Corporation through November 21, 2000. At the conclusion of his employment, Beebe moved to Colorado. At all times relevant to this dispute, Michels was self-insured for purposes of health coverage for its employees up to $40,000 per participant. Michels contracted with WPS through a "Stop-Loss Policy" where WPS insured any health-related costs incurred above the $40,000 amount. In addition, WPS acted as the third-party administrator of Michels' self-insured health plan. Michels also carried liability insurance through Zurich.

¶ 3.　The pertinent facts in this case are undisputed. Beebe's last day of employment with Michels was November 21, 2000. Due to an administrative error, however, Michels did not terminate his health care insurance coverage with WPS. Rather, Michels continued to pay monthly health care insurance premiums for Beebe to WPS for stop-loss coverage.

¶ 4.　Approximately six months later, on May 5, 2001, Beebe was catastrophically injured in a single-car accident in Colorado. He did not have any automobile insurance. Beebe spent the first month following the accident in the trauma center of a hospital. On June 6,

2001, Beebe was transferred to Craig Hospital Rehabilitation Center in Colorado. Before admission, Craig Hospital contacted Michels to confirm that Beebe had health insurance.

¶ 5. On September 18, 2001, while in the midst of processing the medical bills submitted by Craig Hospital for Beebe's care, Michels discovered that it failed to terminate Beebe's medical coverage and give him notice of his COBRA right to continuation of health care coverage. Thus, on September 21, 2001, Michels sent a letter containing the COBRA election form to Beebe. The letter stated:

> On September 18, 2001, it came to our attention that due to an administration error your health care coverage was not appropriately cancelled when you terminated your employment. As a result you have enjoyed the benefit of coverage at no expense to yourself since December 2000. Please note on page two, paragraph one, your coverage expires October 1, 2001; however, a Federal law commonly referred to as COBRA allows you to extend Health Care coverage at your own expense . . . .

On the same date, Michels instructed WPS to terminate Beebe's regular health care plan coverage effective October 1, 2001. On October 16, 2001, Beebe elected COBRA coverage and the premium for two months of coverage was paid for by Craig Hospital on Beebe's behalf.

¶ 6. On November 2, 2001, WPS denied coverage for Beebe's hospital bills, stating that because Michels was delinquent in providing Beebe with his COBRA continuation rights, no coverage existed under the stop-loss policy. On November 7, 2001, Beebe was released from Craig Hospital. The total hospital bill was approximately $355,000, which no one paid.

¶ 7. On December 1, 2001, Beebe's COBRA coverage lapsed as no further premium payments were made.

In December 2002, Craig Hospital sued Michels, alleging causes of action for promissory estoppel and violations of the Colorado Consumer Protective Act—seeking payment for the unpaid hospital bills. Michels submitted the suit to its liability insurer, Zurich, who agreed to defend Michels in the suit.

¶ 8. On July 8, 2003, Zurich settled the Craig Hospital suit by paying $350,000. On November 10, 2004, pursuant to the subrogation clause in the liability policy, Zurich filed suit against WPS, alleging breach of contract and seeking payment of the $350,000 plus interest. Both Zurich and WPS filed motions seeking summary judgment. The motions were heard by the trial court in October 2005. On December 14, 2005, the trial court granted Zurich's motion for summary judgment, denied WPS's motion for summary judgment and awarded Zurich 12% prejudgment interest pursuant to Wis. Stat. § 628.46(1) (2003–04).[1] Because the record did not contain the date that Zurich gave WPS notice of Beebe's claims, the trial court ordered Zurich to supply that information and submit a proposed order for judgment.

¶ 9. On January 27, 2006, WPS objected to Zurich's bill of costs and its submissions regarding prejudgment interest. In response, the trial court ordered additional briefing. By order dated May 15, 2006, the trial court ruled that Zurich was not entitled to recover $248.50 for "Imaging: PDF Files" as a photocopying expense.[2] The trial court again invited additional brief-

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] Zurich conceded that it is not entitled to $113.60 of expenses relating to "OCR imaging of documents." Accordingly, we need not address this expense.

ing on the prejudgment interest issue, noting that it had reconsidered its earlier conclusion that Zurich was entitled to 12% statutory prejudgment interest. Additional briefs were submitted to the trial court on the interest issue in June 2006. On August 4, 2006, the trial court issued its order, granting WPS's objection to Zurich's proposed order for judgment and vacating that portion of the trial court's earlier order awarding 12% prejudgment interest. The trial court concluded that Zurich was not entitled to the statutory 12% interest, but rather, ordered WPS to pay prejudgment interest at the rate of 5% from the date of notice to WPS, which was November 10, 2004. Judgment was granted. WPS appealed the $350,000 subrogation award and Zurich cross-appealed on the issue of interest and photocopying costs. The appeal and cross-appeal are now before this court.

## DISCUSSION

¶ 10. In reviewing a grant of summary judgment, we employ the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). We first examine the pleadings and affidavits to determine whether a claim for relief has been stated. *Id.* If a claim for relief has been stated, we then determine whether any factual issues exist. *Id.* If there is no genuine issue as to any material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision granting summary judgment. *Id.* We independently examine the record to determine if the party is entitled to judgment as a matter of law, but do value the analysis set forth by the trial court. *See Streff v. Town of Delafield*, 190 Wis. 2d 348, 353, 526 N.W.2d 822 (Ct. App. 1994). As

here, when both sides have filed cross-motions for summary judgment, the parties concede there are no issues of material fact, waive trial, and stipulate to the court's resolution of the legal issues. *Precision Erecting, Inc. v. AFW Foundry, Inc.*, 229 Wis. 2d 189, 197, 598 N.W.2d 614 (Ct. App. 1999) ("reviewing court may still decide, as a matter of law, that there are indeed material facts in dispute").

APPEAL

¶ 11. The issue on appeal is whether WPS is obligated to reimburse Zurich for the $350,000 it paid to settle the Craig Hospital suit against Michels related to its ex-employee's medical expenses. This issue requires interpretation of the insurance policies contractual language, which presents a question of law reviewed independently by this court. *See Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 810, 456 N.W.2d 597 (1990). To the extent the policy's language is plain and unambiguous, it is dispositive on the coverage question. *See Allstate Ins. Co. v. Gifford*, 178 Wis. 2d 341, 346, 504 N.W.2d 370 (Ct. App. 1993).

¶ 12. Thus, we examine first the pertinent language of the insurance contracts at issue. The health plan at Michels is contained within a document entitled "Group Master Plan Document." According to the terms of that document, Michels' health plan provides coverage to three groups: (1) current, full-time employees; (2) retired employees who meet age and years of service requirement; and (3) individuals who elect "continuation coverage."

¶ 13. Coverage ends under the Plan "on the earliest of the following dates" as pertinent here: "The day immediately following the last day of the calendar

month a covered employee isn't a full-time employee or is not within the class of employees eligible under the Plan."

> "Continuation coverage" is located in Section 11 of the Plan and provides in pertinent part:

>> All participants covered under the Plan who would otherwise lose coverage as the result of a "qualifying event" have the right to elect continued health care coverage.

>> A qualifying event is any one of the following events which, but for continuation of coverage, would result in the loss of health care coverage:

>> . . . .

>> 2. the termination of the covered employee (other than by the employee's gross misconduct);

>> . . . .

>> No employee, spouse or child will be considered a participant unless, on the date before the qualifying event, that individual was covered under the Plan.

¶ 14. The Plan next sets forth the procedure with respect to election of continuation coverage. First, the Employer must give notice: "Within 14 days of the Employer receiving notice to end coverage, the Employer must notify the participant . . . ." Then, the employee must elect coverage:

> A participant must elect continuation coverage during the 60 day period:

> 1. beginning on the date coverage would otherwise terminate due to a qualifying event; or

> 2. beginning on the date the participant receives notice of his/her continuation rights.

If the participant elects to continue coverage within the 60 day period, the continuation coverage *must be effective as of the date of the qualifying event.*

(Emphasis added.) Generally a participant is entitled to eighteen months of continuation coverage, starting from the qualifying event.

¶ 15. The other insurance policy at issue here is the Stop-Loss Policy issued by WPS, which served as an "excess" policy to cover all amounts exceeding the self-insured components of the Michels' health plan. Specifically, the WPS policy paid all "Plan Payments" incurred between March 1, 2001 and February 28, 2002, in excess of $40,000 per participant. "Plan Payment[s]" are defined to include all medical expenses covered by the Michels' Health Plan:

> "Plan Payment" means a health coverage expense for which charges for covered health care expenses are incurred during the Accumulation Period and for which payment is made within six months following the end of the Accumulation Period on behalf of an eligible employee . . . according to the terms and conditions of the Policyholder's self-funded health plan as described in the Group Master Plan Document.[3]

Plan Payment was defined to exclude, as pertinent to this case "[e]xtra contractual costs or damages relating to the Plan."

---

[3] Although this section required payment "within six months" this term was never enforced and WPS acknowledged that it paid claims under the Stop-Loss Policy regardless of whether Michels fronted the payment to the health care provided. WPS does not rely on the timing of the payments to dispute coverage under its policy, and thus, we need not address this portion of the policy in our opinion.

## A. *Continuation Coverage.*

¶ 16. WPS makes essentially three arguments: (1) the Michels' Group Master Plan coverage ended for Beebe on November 30, 2000, and because he never elected continuation coverage for the period from December 1, 2000 through October 1, 2001, the Plan does not apply; (2) that Michels' payment of Beebe's premiums during this time constituted "extra-contractual costs"; and (3) WPS does not cover claims made during the "continuation coverage" time period of October 1, 2001 through December 1, 2001 because Michels' COBRA notice to Beebe was not timely made.

¶ 17. The language in the policies at issue here is plain and unambiguous. The facts in this case complicate the interpretation of the policies. Thus, we must determine under the undisputed facts and circumstances herein, whether Beebe was a covered participant under the Plan, such that he was covered under the Michels' health plan after he was no longer employed by Michels, but before he was notified of his COBRA rights and elected continuation coverage.

¶ 18. The language of the Michels policy set forth above clearly states that health coverage will end on the first day "following the last day of the calendar month a covered employee isn't a full-time employee or is not within the class of employees eligible under the Plan." Applying that language to the facts here, then because Beebe ceased full-time employment on November 21, 2000, his coverage would end December 1, 2000 *unless* he was within a class of employees eligible under the Plan.

¶ 19. As noted above, there are three classes or groups covered by the Michels' Plan: current full-time employees, retirees and COBRA/continuation partici-

630

pants. The third category is the class at issue here. WPS argues that Beebe did not fit into the COBRA class between December 1, 2000 and October 1, 2001 because he did not elect COBRA coverage until October 2001. The clear policy language requires us to reject WPS's argument.

¶ 20. First, based on the Plan's language, Beebe was eligible for continuation coverage. Section 11.1 of the Plan specifically states that "[a]ll participants covered under the Plan who would otherwise lose coverage as the result of a 'qualifying event' have the right to elect continuation coverage" as long as the participant was covered by the health plan on the day before the "qualifying event." It is undisputed in this case that Beebe was covered by the health plan the day before his qualifying event, which was his last day of employment. Thus, Beebe was eligible for continuation/COBRA coverage.

¶ 21. Second, once the eligibility has been confirmed, Section 11.1 provides that the participant can elect continuation coverage within one of two sixty-day election periods:

> A participant must elect continuation coverage during the 60 day period:
>
> 1. beginning on the date coverage would otherwise terminate due to a qualifying event; or
>
> 2. beginning on the date the participant receives notice of his/her continuation rights.

Based on the clear language of this provision, Beebe had to elect continuation coverage either within sixty days of his termination or within sixty days of his notice of his continuation rights. Again, the facts in this case are undisputed: Beebe was not given notice of continua-

631

tion rights such that he could have elected to participate in the COBRA health plan on his last day of work at Michels. In fact, he was not given notice of his continuation rights until ten months *after* the qualifying event (his termination). Thus, Beebe could not elect coverage under sub. 1. It is further undisputed that Beebe elected continuation coverage within sixty days of receiving notice. According, Beebe complied with sub. 2. above by electing coverage within sixty days of receiving notice.

■

¶ 22. WPS contends that Michels' payment of health premiums for the ten months between termination and notice/election constituted an "extra-contractual" action by Michels to provide insurance coverage to Beebe, and any "extra-contractual" conduct does not obligate WPS's Stop-Loss policy. WPS argues that Michels' error in failing to give timely notice should not obligate WPS to provide coverage. We conclude based on the language of the policies and the interrelationship with COBRA principles, that WPS's contention is incorrect.

¶ 23. Section 11.1 of Michels' health Plan incorporates the COBRA legislation into its written terms, as required by federal law. *See* 29 U.S.C. § 1161. Based on the incorporation, the employer's health plan is obligated to cover the employees' expenses even when the notice of COBRA is deficient or tardy. *See Middleton v. Russell Group, Ltd.*, 483 S.E.2d 727, 732 (N.C. Ct. App. 1997) (concluding that right to elect coverage is tolled until notice is received).[4] In response, WPS cites *Kidder*

---

[4] Michels cites several unpublished foreign cases for the same proposition: *Collins v. Strategic Health Care Mgmt. Servs., Inc.*, 1992 WL 92099, at *5 (N.D. Ill. Apr. 28, 1992);

*v. H&B Marine, Inc.*, 932 F.2d 347 (5th Cir. 1991) and the unpublished case of *Uthell v. Mid-Illinois Concrete, Inc.*, No. 05–4034–JLF, 2006 WL 3590288 (S.D. Ill. Dec. 11, 2006). In these cases, the issue involved which party was responsible to provide the COBRA notice and the courts ruled it was the employer, not the insurer, who was responsible. These cases are not applicable to the particular facts in the instant case.

¶ 24. Further, as noted by the trial court, there is nothing in the language of the WPS policy that excludes, limits, or conditions its coverage based on Michels providing timely election notice to a plan participant: "There is no 'or else' language attached to the statement of the insured's duty to notify plan participants of their right to elect COPRA continuation." If WPS wanted to limit or exclude stop-loss coverage on the basis of untimely election notice, it could have and should have written that exclusion into its policy. *See Mikula v. Miller Brewing Co.*, 2005 WI App 92, ¶ 27, 281 Wis. 2d 712, 701 N.W.2d 613 ("If the Acuity policy intended to exclude coverage for liability arising from the additional insured's own negligence, it should and could have spelled out as much.").

¶ 25. The key issue in this case is whether Beebe's election relates back to the date of termination or whether continuation coverage starts on the date of election. WPS argues that COBRA coverage does not relate back and therefore it is not responsible for any health care costs between Beebe's termination date and the date he elected continuation coverage. Michels argues that because Beebe elected coverage in a timely

*Emilien v. Stull Technologies Corp.*, 70 Fed. Appx. 635, 641 (3d Cir. 2003); and *L.A. Gear California, Inc. v. General Am. Life Ins. Co.*, 1997 WL 702247, at *1 (9th Cir. Nov. 10, 1997). We acknowledge, but do not rely on these decisions.

manner in accord with Section 11.1 sub. 2., the continuation coverage relates back to the qualifying event.

¶ 26. The plain language of the Plan answers this question. Within Section 11.1, the Plan states: "If the participant elects to continue coverage within the 60 day period, the continuation coverage must be effective *as of the date of the qualifying event.*" Thus, based on this language, once Beebe elected continuation coverage, it was retroactive back to the qualifying event—his termination. This language is mandated by COBRA, which requires the employer's plan to provide continuation coverage "for at least the period beginning on the date of the qualifying event." *See* 29 U.S. § 1162(2). This requirement is essential to carrying out COBRA's goal of eliminating any gaps in coverage after a participant experiences a qualifying event. *See, e.g., Lifecare Hospitals, Inc. v. Health Plus of Louisiana, Inc.*, 418 F.3d 436, 441 (5th Cir. 2005). Thus, the policy language is clear, as is the case law on this issue: once a participant elects COBRA coverage, it relates back to the qualifying event. *See Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80 (1998); *Ballard v. Vulcan Materials Co.*, 978 F. Supp. 751, 759 (W.D. Tenn. 1997).

¶ 27. Applying the foregoing to the instant case, because Beebe timely elected to receive continuation coverage, it related back to his date of termination. Thus, Beebe was covered under Michels' health plan as a continuation participant from November 21, 2000 through December 1, 2001. Likewise, because he was covered under Michels' health plan, he was also covered by WPS's Stop-Loss Policy.

¶ 28. We are also not persuaded by WPS's argument that the letter sent to Beebe notifying him that

Michels had continued paying health insurance premiums for him after termination and advising him of his COBRA rights constitutes a definitive statement that between December 1, 2000 and October 1, 2001, Beebe was not a COBRA participant, but was the beneficial recipient of gratuitous health care coverage by a former employer. We are not convinced that such a conclusion is required based on the letter. The policy language applied to the pertinent case law is determinative of how to characterize the time period, not the Michels letter. Moreover, at the time the letter was drafted, Beebe had not yet elected continuation coverage. Until he did, coverage could not revert back to the qualifying event.

¶ 29. Based on the foregoing, we conclude that the untimely notice did not eliminate WPS's obligations under the plain language of its policy, and, once Beebe received notice and timely elected continuation coverage, his coverage was retroactive to the date of the qualifying event. Under these circumstances, Michels' group health Plan provided coverage for all the medical expenses incurred at Craig Hospital. Thus, any amount exceeding $40,000 is covered by the WPS Stop-Loss policy.

*B. Subrogation Issue.*

¶ 30. WPS also argues that principles of subrogation prohibit recovery by Zurich. Specifically, it contends that Zurich does not have superior equity over WPS because Zurich's liability clause does not contain an express subrogation clause and because the loss paid

in the settlement was a different type of loss than that covered by its Stop-Loss policy. We are not convinced.

¶ 31. Zurich, as Michels' liability carrier, stepped in to defend Michels when Craig Hospital sued Michels for failure to pay Beebe's health insurance bills. The right to subrogation arises "when a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *Millers Nat'l Ins. Co. v. City of Milwaukee*, 184 Wis. 2d 155, 168–69, 516 N.W.2d 376 (1994) (citation omitted). Subrogation is intended to prevent a liable party from being unjustly enriched as a result of another's willingness to step in and initially assume the loss. *Travelers Indem. Co. v. Auto Driveaway Co.*, 89 Wis. 2d 255, 260, 278 N.W.2d 262 (Ct. App. 1979). Wisconsin favors the principle of subrogation. *Millers Nat'l*, 184 Wis. 2d at 174. Our review of a subrogation determination is done independently. *Id.* at 164.

¶ 32. Generally speaking, a person seeking subrogation must have "superior equity" over the other party. *See id.* at 163. This principle does not apply to cases involving two insurance companies if both insurance companies have fulfilled their contractual obligations to the insured. *Employers Health Ins. v. General Cas. Co. of Wis.*, 161 Wis. 2d 937, 958, 469 N.W.2d 172 (1991). However, if one of the insurers breaches its contract with the insured, the non-breaching insurer can pursue subrogation against the breaching insurer. *Compare Employers Health, Ins.*, 161 Wis. 2d at 958, *with New Amsterdam Cas. Co. v. Acorn Prods. Co.*, 42 Wis. 2d 127, 166 N.W.2d 198 (1969).

¶ 33. Here, as decided above, WPS was obligated to pay Beebe's health insurance costs according to the

language of its policy. It failed to do so. As a result, its insured, Michels, was sued by Craig Hospital. Zurich then stepped in to handle the suit and was able to reach a settlement with the hospital. Zurich then stepped into the shoes of Michels to recover in a subrogation claim against WPS.

¶ 34. We conclude that Zurich does have superior equity over WPS because WPS breached its contractual obligation to Michels when it refused to pay Beebe's medical bills. *See Millers Nat'l*, 184 Wis. 2d at 171–74 (superior equity exists when a contingent insurer steps in to defend an insured when other insurer neglected its coverage obligations). We also conclude that there are no determinable distinctions in the type of loss as argued by WPS. Although the complaint filed by Craig Hospital made claims against Michels for promissory estoppel and violation of Colorado's consumer protection act, the basis for the complaint related to the medical costs. WPS's argument in this regard is without merit.

CROSS-APPEAL

¶ 35. Zurich raises two contentions on its cross-appeal: (1) that the trial court erred in ruling that it is entitled to 5% prejudgment interest, but not 12% prejudgment interest; and (2) that document imaging is a form of "photocopying" and thus should constitute a taxable cost under Wis. Stat. § 814.04(2). Because the trial court did not err in deciding these issues, we affirm on the cross-appeal.

*A. Prejudgment Interest.*

¶ 36. Zurich first contends that it is entitled to the 12% prejudgment interest pursuant to Wis. Stat.

§ 628.46(1). The trial court, although initially agreeing and awarding 12% prejudgment interest, reconsidered and concluded that Zurich was entitled to 5% prejudgment interest.[5] The trial court ruled that the principles of subrogation prohibit Zurich from recovering more than the amount it actually disbursed. We agree.

¶ 37. This issue involves interpretation of Wis. Stat. § 628.46(1).[6] As such, the issue presents a question of law, which we review independently. *Racine Harley-Davidson, Inc. v. State of Wis. Div. of Hearing & Appeals*, 2006 WI 86, ¶ 11, 292 Wis. 2d 549, 559–60, 717 N.W.2d 184.

¶ 38. Zurich argues that its subrogation interest permits it to step into Michels's shoes to assert a 12%

---

[5] There is no claim or argument that awarding the 5% prejudgment interest was erroneous. Accordingly, our opinion addresses only the contested issue of whether the 12% prejudgment interest was appropriate.

[6] Wisconsin Stat. § 628.46 provides, as material:

**Timely payment of claims. (1)** Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss. If such written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after written notice is furnished to the insurer. Any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any claim is overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the U.S. mail in a properly addressed, postpaid envelope, or, if not so posted, on the date of delivery. All overdue payments shall bear simple interest at the rate of 12% per year.

interest claim pursuant to the terms of WIS. STAT. § 628.46(1). We reject Zurich's argument.

¶ 39. Subrogation, based on the facts and circumstances here, does not permit recovery of 12% interest. Legal subrogation gives indemnity only, and an insurer who possesses a cause of action for subrogation cannot recover beyond the amount actually dispersed by it. *D'Angelo v. Cornell Paperboard Prods. Co.*, 19 Wis. 2d 390, 402, 120 N.W.2d 70 (1963). The purpose of subrogation is to have the party who should have paid the debt, reimburse the party who actually paid the debt, to the extent of the payments made. *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 443–45, 360 N.W.2d 33 (1985). The subrogee "cannot recover recovery beyond the amount actually disbursed by it." *Id.* at 454.

¶ 40. Under the undisputed facts in this case, Zurich paid a $350,000 compromised settlement on behalf of its insured, Michels. It did not pay the actual amount of the medical costs incurred, which exceeded $355,000, nor did it pay Michels for the loss of its "time value of money." Thus, Zurich is entitled to reimbursement from WPS for the extent of the payment it made, but is not entitled to recover prejudgment interest under WIS. STAT. § 628.46. Therefore, based on the foregoing, we affirm the trial court's decision with respect to prejudgment interest.[7]

---

[7] We also note that this case is dissimilar from *Kontowicz v. American Standard Insurance Co. of Wisconsin*, 2006 WI 48, 290 Wis. 2d 302, 714 N.W.2d 105 as *Kontowicz* involved a third party claim, which is specifically referred to within WIS. STAT. § 628.46. The instant case is a subrogation case, which is not referred to within the statute.

*B. Imaging Costs.*

¶ 41. Zurich next claims the trial court erred in denying its request for $460.18 for "photocopies" as an item of cost under WIS. STAT. § 814.04(2). WPS objected to this particular item of cost because these documents were not actually photocopies, but rather reproduced through an imaging process, creating an electronic, rather than a hard copy of the documents at issue.

¶ 42. Again, our standard of review is *de novo* as this involves the interpretation of the costs statute, WIS. STAT. § 814.04(2), which permits reimbursement for "photocopying." Zurich argues that the newer technology of imaging is essentially the same as photocopying and thus should be included as an item of costs. The trial court rejected Zurich's argument, ruling:

> This is clearly a circumstance where the law has not kept pace with technology. By use of the term "photocopying," the Legislature seems to have intended that prevailing parties recover the costs of reproducing documents. However, the term of art chosen by the Legislature, "photocopying," is not really up to the task. . . . [N]ot all "copies" get reproduced on paper. Indeed, in the current era both bench and bar are striving to be "paperless." Some law firms and court systems are ahead of others, and the elite tend to reproduce documents in electronic form rather than on paper.
>
> So, the question becomes, can the word "photocopy" be stretched enough to cover "copies" of documents reproduced in electronic media rather than on paper? I do not think so, for two interrelated reasons.

The trial court then went on to set forth its two reasons, the first of which is that case law requires that the costs

statute be narrowly construed. *See Kleinke v. Farmers Co-op. Supply & Shipping*, 202 Wis. 2d 138, 148, 549 N.W.2d 714 (1996). The second reason was that the ordinary meaning of the term "photocopying" does not embrace "digital electronic reproduction contained on electronic media .... [W]e simply do not refer to the images contained in PDF documents on CDs, floppy disks, hard drives and the like as 'photocopies;' 'photocopies' seems to refer only to hard copy."

¶ 43. We agree with and adopt as our own the trial court's analysis on this issue. As the statute currently reads, "photocopying" must be narrowly construed to include only hard copy photocopies, rather than electronic imaging. Although both serve essentially the same ultimate purpose, they are not physically the same. Thus, unless the legislature revises the statute to add electronic reproduction/imaging to the statute as an item of cost, imaging costs do not fall within the costs statutes and the trial court properly excluding this item of costs from what Zurich is entitled to recover.

## CONCLUSION

¶ 44. In sum, we affirm on both the appeal and the cross-appeal. We conclude that the trial court correctly ruled that WPS must reimburse Zurich for the $350,000 payment it made in settlement of the lawsuit against Michels. We conclude that Zurich is not entitled to 12% prejudgment interest on its subrogation claim and that it is not entitled to recover costs associated with imaging reproduction.

*By the Court.*—Order affirmed.

¶ 45. FINE, J. (*concurring in part; dissenting in part*). I join in the Majority opinion except for its

641

resolution of the PDF-costs issue. It is paradigm we apply statutes as they are written. *State ex rel. Kalal v. Circuit Court*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 662, 681 N.W.2d 110, 123–124. The word "photocopying" has two discrete parts: (1) photo, and (2) copying; that is, making a copy using light.[1] There is no dispute that a method of making PDF files is by using a photocopy machine—a scanner, much like a xerographic scanning bed.

¶ 46. There is also no dispute that Zurich American made the PDF copies for which it seeks costs by scanning paper documents. Rather than transmitting the resulting light-generated electronic impulses into a print head, Zurich American's device transmitted the impulses to a CD. In short, Zurich American took a "photo" of the documents (using its scanner) and then copied them to a CD; that is a "photocopy" no matter how "narrow" the word is read. I would grant Zurich American its request for $460.18 for "photocopies" as an item of costs under WIS. STAT. § 814.04(2). Accordingly, I respectfully concur in part and dissent in part.

---

[1] The Online Etymology Dictionary gives the origin of the word "photocopy":

> photocopy (v.): 1924 in the sense of "make a photographic repro-duction," from *photo-* "light" + *copy* (q.v.). The usual modern meaning arose 1942 with the advent of xerography. The noun is recorded from 1934. *Photostat* (1911) was a type of copying machine (trademark Commercial Camera Company, Providence, R.I.) whose name became a generic noun and verb (1914) for "photocopy."

http://www.etymonline.com/index.php?term=photocopy.